Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL VI

| | | |
|---|---|---|
| SOLETANCHE, INC.<br><br>Demandante<br>Apelado/Recurrido<br><br>v.<br><br>L.P.C. & D., INC. (T/C/P LAS PIEDRAS CONSTRUCTION AND DEMOLITION, INC.), ET AL.<br><br>Demandados - Apelantes | | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil Núm.:<br>K AC2006-8443 (508) |
| L.P.C. & D., INC.<br><br>Demandante contra co-parte - Apelantes<br><br>v.<br><br>AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS<br><br>Co-parte demandada Apelado/ Apelante/Peticionario | KLAN202200633<br>KLAN202200634<br>KLAN202200643<br>KLAN202200726<br>KLCE202201012<br>KLCE202201013 | Sobre:<br>Incumplimiento de Contrato |
| L.P.C. & D., INC.<br><br>Reconvinente - Apelantes<br><br>v.<br><br>SOLETANCHE, INC.<br><br>Reconvenido Apelado/Recurrido | | |

Panel integrado por su presidenta, la Jueza Birriel Cardona, la Jueza Santiago Calderón y la Jueza Álvarez Esnard

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de junio de 2023.

A tenor con las disposiciones de la Regla 80.1 del Reglamento del Tribunal de Apelaciones[1], 28 de septiembre de 2022 se ordenó

---

[1] 4 LPRA Ap. XXII-B, R. 80.1. Véase, Orden Administrativa Núm. DJ 2019-316A, sobre consolidación de recursos en el Tribunal de Apelaciones y Procedimientos Internos en la consideración de recursos.

la consolidación de los recursos KLAN202200726, KLCE202201012 y KLCE202201013 con los recursos KLAN202200633, KLAN202200634 y KLAN202200643 previamente consolidados, en atención a que en estos se recurre de determinaciones emitidas de un mismo caso. Asimismo, se autorizó hacer referencia al apéndice incluido en el recurso KLAN202200633.

L.P.C.&D., Inc. (LPC&D), Zurich American Insurance Company (Zurich), Fidelity & Deposit Company of Maryland (Fidelity), XL Speciality Insurance Company (XL Speciality) y XL Reinsurance America, Inc. (XL Reinsurance) (en conjunto LPC&D y las Fiadoras) comparecen como apelantes en el recurso KLAN202200633, presentado el 12 de agosto de 2022, en el cual solicitan la revisión de la Sentencia emitida el 6 de mayo de 2019, notificada el 7 de mayo de 2019, por el Tribunal de Primera Instancia, Sala de San Juan (TPI o foro primario). Además, comparecen en el KLAN202200726, presentado el 12 de septiembre de 2022, y solicitan la revisión de la Resolución emitida y notificada el 14 de julio de 2022 por el mismo foro primario.

En el recurso KLAN202200634, presentado el 12 de agosto de 2022, figura como apelante la codemandada y demandante contra coparte, CSA Group, Inc. (CSA). En este, se solicita la revisión de la misma Sentencia emitida el 6 de mayo de 2019, notificada el 7 de mayo de 2019 por el TPI.

La demandada, Autoridad de Acueductos y Alcantarillados (AAA), comparece como parte apelante en el recurso KLAN202200643, presentado 15 de agosto de 2022 y, también solicita la revisión de la Sentencia emitida el 6 de mayo de 2019, notificada el 7 de mayo de 2019 por el TPI. Asimismo, comparece como parte peticionaria en los recursos KLCE202201012 y KLCE202201013, presentados ambos el 12 de septiembre de 2022.

Igualmente, en estos se solicita la revisión de la Resolución emitida y notificada el 14 de julio de 2022 por el foro primario.

Cabe destacar que, en los recursos **KLAN202200633, KLAN202200634 y KLAN202200643**, el foro primario adoptó en su totalidad el Informe del Comisionado Especial.

Mientras que, en los recursos **KLAN202200726, KLCE202201012 y KLCE202201013,** el TPI decidió mantener la decisión dictada el 10 de diciembre de 2019 y declaró Ha Lugar el Memorando de Costas presentado por Soletanche y el Memorando de Costas presentado por LPC&D y las Fiadoras.

Por los fundamentos que expondremos a continuación, **modificamos** la *Sentencia* apelada y la *Resolución* impugnada y, así modificadas, se confirman.

**I.**

Según surge de los expedientes consolidados, la AAA es dueña del proyecto conocido como Río Blanco *Off-Stream Reservoir & Intake Facilities* o Embalse de Río Blanco, en el municipio de Naguabo, Puerto Rico (Proyecto). El Proyecto consistió en la construcción de una represa para embalsar las aguas del Río Blanco en Naguabo, así como las tomas de agua, canales de desbordamiento y facilidades relacionadas. Dicho Proyecto requirió, entre la multiplicidad de trabajos, la instalación de 14,330 columnas de piedra.

La AAA contrató a la firma Gregory L. Morris & Associates (GregMorris) para que diseñara el Proyecto y atendiera los asuntos de rediseño, revisión de planos, especificaciones y geotecnia del Proyecto. A su vez, GregMorris subcontrató a las firmas Golder & Associates (Golder) y a GeoConsult Geotechnical Engineer (Geoconsult) para que le asistieran en el diseño del embalse.

El 14 de enero de 2005, LPC&D y la AAA suscribieron un contrato de obra pública para la construcción del Proyecto por la suma de $103,632,270.00[2]. El 22 de junio de 2005, LPC&D y Soletanche suscribieron un subcontrato por la cantidad de $8,130,000.00, en el que esta última se obligó a construir las columnas de piedra[3].

Mientras que, el 27 de junio de 2005, Soletanche y HB Puerto Rico, L.P. (HB) suscribieron un subcontrato para que HB realizara aproximadamente el 50% del trabajo de instalación de columnas de piedra. Además, el 4 de octubre de 2005, la AAA contrató a CSA para que actuase como gerente del Proyecto[4].

El 31 de mayo de 2006, Soletanche terminó sustancialmente los trabajos por los cuales fue subcontratado. Posteriormente, el 9 de agosto de 2006, Soletanche y HB cursaron a LPC&D una reclamación extrajudicial titulada *"Demand for Payment and Compensation"*[5], relacionada con los trabajos de instalación de columnas de piedra en el Proyecto. El 6 de octubre de 2006, LPC&D pasó a la AAA, por conducto de CSA, la reclamación presentada por Soletanche[6]. Luego, el 2 de noviembre de 2006, Soletanche presentó reclamación directa a la AAA bajo el Artículo 1489 del Código Civil de Puerto Rico, *infra*[7].

El 26 de diciembre de 2006, Soletanche presentó **Demanda**[8] sobre cobro de dinero contra la AAA, LPC&D, las Fiadoras y CSA. En síntesis, alegó que se le exigió realizar trabajo adicional a lo

---

[2] Véase Apéndice Conjunto (Ap.), págs. 2344-2350.
[3] Véase Ap., págs. 2672-2681.
[4] Véase Ap., págs. 2113-2168.
[5] Véase Ap., págs. 2656-2670.
[6] Véase Ap., págs. 4578-4579.
[7] Véase Ap., pág. 647. El referido Código Civil de Puerto Rico de 1930, según enmendado, 31 LPRA ant. sec. 1 *et seq.,* fue derogado por el Código Civil de Puerto Rico de 2020, aprobado mediante la Ley Núm. 55 de 1 de junio de 2020, según enmendada, 31 LPRA sec. 5311 *et seq*. No obstante, para fines del presente caso, se hace referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable a la controversia ante nuestra consideración.
[8] Véase Ap., págs. 1-16.

contratado. Soletanche reclamó la suma de $4,366,026.15 por los siguientes conceptos, a saber:

| | |
|---|---|
| a) Largo de columnas construidos e instalados y no pagados | $770,241.08 |
| b) Cambios en los criterios de compactación de la piedra, incrementando el diámetro de las columnas | $1,103,020.31 |
| c) Detención en la compactación de las puntas de arena de los pilotes | $314,777.50 |
| d) Conforme contrato, tiempo de turnos estáticos y estériles por retrasos causados por otros | $1,215,218.31 |
| e) Trabajo certificado y adeudado desde al menos mayo de 2006 | $962,768.95 |

A su vez, reclamó los intereses legales que por ley y contractualmente procedan, más una suma razonable en concepto de costas, gastos y honorarios de abogado. Soletanche arguyó que LPC&D, las Fiadoras, CSA y la AAA le son solidariamente responsables por la totalidad de las sumas reclamadas en la demanda.

El 19 de marzo de 2007, la AAA presentó su *Contestación de Demanda*[9]. En esta, adujo que, al momento de la presentación de la demanda, la AAA nada le adeuda a LPC&D, por lo que la reclamación instada al amparo del Artículo 1489 del Código Civil de Puerto Rico, *infra*, en contra de la AAA es improcedente.

El 30 de marzo de 2007, CSA presentó *Contestación a Demanda*[10] en la que aceptó haber sido contratada por la AAA para actuar como representante de esta y prestar servicios durante la construcción del Proyecto. Como defensa afirmativa, entre otras, sostuvo que no ha intervenido en forma alguna en el contrato entre Soletanche y LPC&D, ni ha asumido obligación alguna con Soletanche. Así, CSA solicitó la desestimación de la reclamación en su contra.

---

[9] Véase Ap., págs. 17-22.
[10] Véase Ap., págs. 23-26.

El 22 de mayo de 2007, LPC&D y las Fiadoras[11] presentaron *Contestación de Demanda, Defensas Afirmativas y Reconvención Compulsoria*[12] en la que negaron la mayoría de las alegaciones en su contra y formularon varias defensas afirmativas. Estas alegaron que LPC&D no exigió que se construyese la obra por la cual reclama y negó que adeudara suma alguna a Soletanche. Sostuvieron que LPC&D solo viene obligado a pagar a Soletanche por trabajos aceptados y pagados por la AAA a LPC&D.

En la ***Reconvención Compulsoria***, LPC&D adujo que el subcontrato con Soletanche estableció un término de seis (6) meses para la realización de los trabajos y Soletanche tardó 10.5 meses en terminar los mismos. Arguyó que, los trabajos que pretende cobrar Soletanche en su reclamación no han sido aprobados por la AAA, por lo cual LPC&D no es responsable del pago de estos. Así, LPC&D reclamó a Soletanche la suma de $5,413,692.00 por los siguientes conceptos:

| | |
|---|---|
| a) Pérdida de Bono | $900,000.00 |
| b) "Job Extended Overhead" | $1,212,064.00 |
| c) Equipo paralizado | $2,300,000.00 |
| d) Arena para "Stone Columns" | $173,628.00 |
| e) Daños a Plataforma de Trabajo | $828,000.00 |

Además, LPC&D reclamó los intereses legales correspondientes y una suma de $100,000.00 en concepto de honorarios de abogado.

En esta misma fecha, LPC&D presentó ***Demanda Contra Copartes***[13] contra la AAA y CSA, en la cual incluyó sus reclamaciones y las reclamaciones de sus subcontratistas Soletanche y Longo de Puerto Rico (Longo), entre otras. Señaló que

---

[11] Se identifica a las Fiadoras como las entidades que emitieron cierta fianza a favor de LPC&D. Zurich es la fiadora principal y está autorizada a representar a KL Specialty y XL Reinsurance en el caso de epígrafe.
[12] Véase Ap., págs. 27-44.
[13] Véase Ap., págs. 45-54.

bajo la demanda contra coparte, la AAA y CSA le adeudan la suma de $14,160,099.16, más la cantidad que Longo pueda establecer que le es adeudada najo su reclamación. LPC&D desglosó las siguientes cuantías:

| | |
|---|---|
| **Primera Causa de Acción**<br>Suma reclamada por Soletanche en la demanda | $4,366,026.15 |
| **Segunda Causa de Acción**<br>a.  Pago de "Stone Columns" | $1,111,437.66 |
| b.  Pago de "Arena Núm. 10" utilizada en los "Stone Columns" en el espesor de la plataforma | $184.046.55 |
| c.  Reclamación sometida por Soletanche para la instalación de los "Stone Columns" | $1,227.661.61 |
| d.  Reclamación sometida por Soletanche por detención de los trabajos por indecisión de AAA y CSA | $350,347.36 |
| e.  Reclamación de Soletanche por detenciones de la obra que provocaron que el proyecto se tardara más tiempo de lo estimado | $1,215,218.31 |
| f.  Reclamación de LPC&D por adquisición de equipo digital | $193,590.32 |
| g.  Reclamación de LPC&D por mitigación de terrenos "wetlands" requeridos por Cuerpo de Ingenieros | $800,000.00 |
| h.  Reclamación de LPC&D por reparación de tubería de 27 pulgadas | $14,000.00 |
| i.  Reclamación de LPC&D por cambios de condiciones presentadas | $8,900,000.00 |
| j.  Reclamación del subcontratista Longo de Puerto Rico | Cantidad aproximada entre: $1,000,000.00 y $11,000,000.00 |

Conjuntamente, LPC&D solicitó los intereses legales acumulados desde el origen de la causa de acción y hasta su completo pago, las costas y una suma no menor de $100,000.00 por concepto de honorario de abogado por temeridad.

El 11 de julio de 2007, Soletanche presentó *Contestación a Reconvención*[14] instada por LPC&D. El 20 de julio de 2007, AAA y CSA presentaron su *Contestación Demanda Contra Coparte*[15]. Estos negaron la mayoría de las alegaciones en su contra.

Posteriormente, el 27 de octubre de 2008, LPC&D y AAA firmaron un Acuerdo Transaccional Parcial (Acuerdo[16] para finiquitar parcialmente las reclamaciones alegadas en la *Demanda contra Copartes,* a saber:

| | |
|---|---|
| **Primera Causa de acción**<br>Suma reclamada por Soletanche en la demanda | Transada |
| **Segunda Causa de Acción**<br>a. Pago de "Stone Columns" | Transada |
| b. Pago de "Arena Núm. 10" utilizados en los "Stone Columns" | $184.046.55 |
| c. Reclamación sometida por Soletanche para la instalación de los "Stone Columns" | $1,227.661.61 |
| d. Reclamación sometida por Soletanche por detención de los trabajos por indecisión de AAA y CSA | $350,347.36 |
| e. Reclamación de Soletanche por detenciones de la obra por lo que el proyecto se tardó más de lo estimado | $1,215,218.31 |
| f. Reclamación de LPC&D por adquisición de equipo digital | Transada<br>$51,000.00 |
| g. Reclamación de LPC&D por mitigación de terrenos | Transada |

---

[14] Véase Ap., págs. 55-57.
[15] Véase Ap., págs. 58-63.
[16] Véase Ap., págs. 4550-4560.

"wetlands" requeridos por
Cuerpo de Ingenieros

| | | |
|---|---|---|
| h. | Reclamación de LPC&D por reparación de tubería de 27 pulgadas | Transada $10,000.00 |
| i. | Reclamación de LPC&D por cambios de condiciones presentadas | Transada $3,500,000.00 |
| j. | Reclamación del subcontratista Longo de Puerto Rico | Transada $858,123.00. |

Además, en el referido Acuerdo, LPC&D y AAA pactaron lo siguiente:

[…]

DOS: LPCD se reafirma en sus alegaciones y defensas en su contestación a la Demanda y su reconvención en cuanto a las reclamaciones de Soletanche. **LPCD y la AAA acuerdan que del tribunal en su día determinar que procede el pago de alguna suma a Soletanche por LPCD por concepto de reclamaciones de Soletanche en la Demanda y que a su vez AAA tenga que pagar a LPCD por concepto de tales reclamaciones de Soletanche y que medie una determinación judicial final de que la AAA fue responsable de los actos en que se basa el derecho de cobre de Soletanche, la AAA pagará a LPCD las sumas pagadas por LPCD a Soletanche** sin los "mark-ups" aplicables en conformidad con los términos del Contrato, **excepto:** (i) que la AAA pagará a LPCD un seis por ciento (6%) por concepto de arbitrios, patentes, fianzas y seguros sobre toda partida que la AAA venga obligada a pagar bajo los incisos C, D y E de la segunda causa de acción de la Demanda de Co-parte; y (ii) en el caso del inciso A y B de la segunda causa de acción de la Demanda de Co-parte, en que la AAA pagará a LPCD al precio de la partida del contrato para dichos trabajos. (Énfasis nuestro).

[…][17]

Las partes, al llegar al Acuerdo antes mencionado, transaron las siguientes reclamaciones de la *Demanda Contra Copartes,* a saber: **la primera causa de acción de LPCD contra la AAA en la**

---

[17] Véase Ap., pág. 4552.

*Demanda Contra Coparte* **y de los incisos "F", "G", "H", "I" y "J" de la segunda causa de acción de LPC&D[18].**

Cabe destacar que las siguientes causas de acción de la *Demanda Contra Copartes* de LPC&D no fueron transadas por el Acuerdo previamente mencionado a saber:

i.  Pago de "Arena Núm. 10" utilizada en los "Stone Columns" en el espesor de la plataforma de trabajo por la cantidad de $184,046.55.

ii.  Reclamación sometida por Soletanche, subcontratista de LPC&D para las instalaciones de los "Stone Columns" por la cantidad de $1,227,661.61 por motivo de que la AAA y CSA cambiaron los criterios especificados en el contrato para la compactación de la piedra de los "Stone Columns".

iii.  Reclamación sometida por Soletanche por motivo de detención de los trabajos por la indecisión de la AAA y la inacción y omisión culposa y negligente de CSA en la aprobación de los pagos resultantes del cambio de la compactación de la punta de arena en los "Stone columns", por la cantidad de $314,777.50 dicho monto se multiplica por 1.05 (+5% Beneficio) y 1.06 arbitrios y seguros la cantidad será $350,347.36.

iv.  Reclamación por $1,215,218.31 sometida por Soletanche por detenciones de la obra que ocasionaron que la terminación del proyecto le tomará más tiempo que el estimado dicho monto se multiplica por 1.05 (+5% Beneficio) y 1.06 arbitrios y seguros la cantidad será $1,392,605.98.

El 22 de octubre de 2008, LPC&D y la AAA presentaron una *Moción de Desistimiento Parcial*[19], en la cual le notificaron al TPI que firmaron el Acuerdo sobre la *Demanda Contra Copartes* presentada por LPC&D el 22 de mayo de 2007.

En virtud de lo anterior, el 3 de noviembre de 2008, notificada el 14 de noviembre de 2008, el foro primario notificó *Sentencia Parcial*[20] mediante la cual decretó el archivo con perjuicio de las alegaciones de incumplimientos contractuales y negligencia de LPC&D contra la AAA de la primera causa de acción y de los incisos "F", "G", "H", "I" y "J" de la segunda causa de acción de la *Demanda*

---

[18] Véase Ap., pág. 4559.
[19] Véase Ap., págs. 64-65.
[20] Véase Ap., págs. 66-69.

*Contra Copartes.* Posteriormente, a petición de LPC&D, el 24 de noviembre de 2008, notificada el 8 de diciembre de 2008, el TPI dictó **Sentencia Parcial Nunc Pro Tunc**[21].

Por otra parte, el 4 de agosto de 2009, la AAA y CSA presentaron a su vez *Demanda Contra Coparte*[22] contra LPC&D, en la que afirmaron que la AAA no le adeuda nada a Soletanche y que quien debe responder es LPC&D. El 19 de octubre de 2009, LPC&D presentó su contestación a demanda contra coparte de AAA y CSA[23].

El 1 de septiembre de 2010, Soletanche presentó una *Solicitud de Sentencia Sumaria*[24] contra LPC&D, las Fiadoras, la AAA y CSA. En esencia, alegó que LPC&D le responde contractualmente a Soletanche por todas las partidas reclamadas en la demanda, bajo el contrato suscrito entre ambos para la construcción de columnas de piedra en el Proyecto de la AAA.

Por su parte, el 9 de agosto de 2012, LPC&D y las Fiadoras presentaron su oposición a la solicitud de sentencia sumaria presentada por Soletanche y solicitaron que se dictara sentencia sumaria parcial a su favor[25]. Estas alegaron que no responden por las partidas reclamadas por Soletanche debido a que no se le adeudan o, si se le adeudan, son la AAA y/o CSA quienes responden a Soletanche directamente. En la alternativa, LPC&D adujo que de responder a Soletanche, entonces la AAA y/o CSA le responden a

---

[21] Véase Ap., págs. 70-73. Ver *Sentencia Parcial Nunc Pro Tunc* de 24 de noviembre de 2008, la cual especifica que:

[...]
Se dicta la presente por no existir razón para posponer dictar sentencia parcial, en cuanto a la AAA con relación a las alegaciones de incumplimientos contractuales y negligencia de LPC&D contra **AAA de la Primera Causa de Acción de LPC&D contra la AAA en la Demanda Contra Copartes y de los incisos "F", "G", "H", "I" y "J" de la Segunda Causa de Acción de LPC&D** contra la AAA de la Demanda Contra Copartes, hasta la resolución total del pleito. El caso continuará contra los demás demandados en su totalidad y contra la AAA en cuanto a los incisos "A", "B", "C", "D" y "E" de la Segunda Causa de Acción de la Demanda Contra Copartes.

[22] Véase Apéndice Conjunto, págs. 82-83.
[23] Véase Ap., págs. 92-93.
[24] Véase Ap., págs. 94-151.
[25] Véase Ap., págs. 190-301.

LPC&D por dichas cantidades, debido a que el subcontrato entre Soletanche y LPC&D era en total acuerdo con las especificaciones del Proyecto. Así, LPC&D solicitó que se dicte sentencia sumaria parcial a su favor respecto a las causas de acción relacionadas al cambio de criterio de aceptación de la parte de piedra de las columnas y a las pruebas y detenciones relacionadas al criterio de aceptación de la parte de arena de las columnas de piedra.

Luego de varios trámites procesales, el 12 de junio de 2014, notificada el 24 de junio de 2014, el TPI designó al Lcdo. Jorge R. Jiménez como Comisionado Especial (Comisionado) en el presente caso. El foro primario delegó al Comisionado Especial los poderes y facultades que establece la Regla 41.3 de Procedimiento Civil[26]. El 20 de febrero de 2015, las partes sometieron al Comisionado un *Informe de Conferencia con Antelación al Juicio*[27]. El 31 de marzo de 2015, notificada el 6 de abril de 2015, el TPI emitió una *Resolución*[28] en la que declaró No Ha Lugar la Solicitud de Sentencia Sumaria presentada por LPC&D. El foro primario formuló ocho (8) determinaciones de hechos pertinente sobre los cuales no existe controversia y consignó cinco (5) hechos esenciales en controversia.

Posteriormente, el 4 de diciembre de 2018, el Comisionado emitió su Informe[29] en el que expone, analiza y recomienda al TPI la solución a las controversias del caso. En lo pertinente, del Informe del Comisionado surge lo siguiente:

---

[26] Particularmente, se le delegaron las siguiente facultades: 1) celebrar vistas evidenciarías e inspecciones oculares, y regular los procedimientos en toda vista celebrada ante él; 2) realizar cualquier acto y tomar cualquier medida que fuere necesaria o adecuada para el cumplimiento eficiente de sus deberes bajo la Orden; 3) exigir que se produjera ante él cualquier prueba sobre todos los asuntos comprendidos en su encomienda, incluyendo la producción de todos los estudios de valoración, informes periciales de ingeniería y/o cualquier otra materia, así como todos los documentos y escritos pertinentes y necesarios para adjudicar las controversias; 4) decidir sobre la admisibilidad de la prueba; 5) juramentar testigos y examinarlos y citar a las partes en el pleito y examinarlas bajo juramento; y 6) recomendar la imposición de sanciones a las partes o sus representantes legales, en caso de incumplimiento con sus órdenes.
[27] Véase Ap., págs. 557-699.
[28] Véase Ap., págs. 702-708.
[29] Véase Ap., págs. 1226-1318.

**Obligación de pagar:**

[...]

La exigencia de pago por Soletanche existe porque la AAA y CSA se han negado a permitir que LPC&D y Soletanche incorporen a sus certificaciones mensuales múltiples trabajos exigidos a y realizados por Soletanche para la AAA y para LPC&D. Lo mismo ocurre respecto a los trabajos que Soletanche realizó y no se le ha permitido facturarlo en sus certificaciones mensuales. Por lo tanto, son la AAA y CSA quienes han impedido que se cumpla la condición que invocan para que las cuantías que Soletanche y LPC&D reclaman sean pagaderas. Ante la ley, la condición se tiene por cumplida desde que se impidió el cumplimiento de la condición. El Demand for Payment presentado por Soletanche es una factura, que incorpora lo que durante la obra no le fue permitido a Soletanche ni a LPC&D facturar. Lo reclamado por Soletanche está vencido, es pagadero y devenga intereses desde agosto de 2006.

En los hechos y en el derecho, la obligación de pago de LPC&D y de la AAA para con Soletanche existe al menos desde que cursó el Demand for Payment (existe desde 77 días después que se realizó la labor y no se permitió facturarla) habiendo ya concluido sus labores y alcanzada terminación sustancial. Con ello también comienza la acumulación de intereses y la obligación de pagarlos, tanto por la AAA como por LPC&D[30].

**Pacto de Pago de Honorarios de Abogado:**

[...]

Se determina [p]rocedente el pago de los honorarios de abogado en la cuantía adelante expuesta, reclamados por Soletanche por LPC&D y sus fiadoras, quienes recobraran esas cuantías de la AAA, porque fue la actuación de la AAA lo que ha hecho inevitable el prologando trámite judicial[31].

**Las Fiadoras de Obra Pública:**

[...]

Las fiadoras [...] son responsables a Soletanche solidariamente bajo la fianza número 08755115; y esas fiadoras podrán cobrar o recobrar la totalidad de su responsabilidad contra la AAA. Ello incluye, pero no se limita al recobro contra los fondos que la AAA ha retenido bajo el artículo 1489 del Código Civil[32].

**Causalidad:**

Los actos, omisiones, exigencias e incumplimientos por la AAA para con aquellas porciones del contrato referentes a las columnas de piedra, han sido la causa directa, eficiente y real de los adeudos reclamados por Soletanche, y también por el restante reclamo de LPC&D por la arena suministrada, que se instaló dentro del espesor de la plataforma de trabajo y no ha sido pagada.

Los hechos estipulados y la evidencia desfilada, considerando la totalidad de los hechos y evidencia brinda convencimiento legal al Comisionado que las exigencias impuestas a Soletanche, en la cadena de mando y

---

[30] Véase Ap., pág. 1299.
[31] Véase Ap., pág. 1302.
[32] Véase Ap., pág. 1303.

comunicación (AAA, CSA-Gregory Morris, LPC&D, Soletanche) constituyen el factor y conducta que generó que los trabajos se ejecutasen y midiesen en forma diferente a lo contratado. También brindan los hechos, la convicción de que esta conducta de AAA fue desplegada con el deliberado propósito de exigir y obtener sustancial trabajo y valor de Soletanche y LPC&D sin pagar por el mismo, conforme se contrató que sería pagado. Ello constituye dolo en el cumplimiento de las obligaciones. [...].

Respecto a CSA la cadena de causalidad quedó interrumpida cuando LPC&D recurrió al trámite administrativo para reclamar, y la AAA adoptó y avaló el exigir que la obra se pueda facturar. [...][33].

**Reconvención y Demanda Contra Coparte de LPC&D:**

[...]

Resulta de lo expuesto y determinado que la reconvención presentada por LPC&D contra Soletanche no procede y por lo tanto, se recomienda su desestimación con perjuicio.

Respecto a la demanda contra coparte de LPC&D contra la AAA por la arena colocada dentro del espesor de la plataforma de trabajo, se estableció que era indispensable, procede el pago del largo de las columnas construido dentro de la plataforma y corresponde que la AAA le pague a LPC&D la arena que suplió y que no le fue pagada, por haberse instalado est[a] dentro del espesor de la plataforma. Así también, procede que la AAA le pague a LPC&D los cargos gubernamentales y arbitrios municipales, que reclama correspondientes a los pagos que LPC&D y sus fiadoras tiene que hacer a Soletanche, en otras palabras, se declara Con Lugar la demanda contra coparte de LPC&D contra la AAA, en la medida que ha sobrevivido la transacción[34].

**Cuantías Reclamadas, Prueba Pericial y Valoración:**

[...]

Concluye el Comisionado y recomienda que el valor del trabajo se compute con valoración reconociendo que la planificación de ejecución de obra fue a seis meses, pero intereses computados al seis por ciento anual (no al 8%), porque debe entenderse que "Wall Street prime rate", es interés flotante y no fijo al momento del evento. [...].

Por tanto, reconociendo que respecto los trabajos realizados, los aparejos no estuvieron estáticos, que la productividad de éstos es diferente a la tarifa pactada por turno estático, que el trabajo se realizó y que no se ha pagado, procede el pago a **Soletanche** por la AAA, como sigue:

Pago del valor de las columnas dentro de la plataforma
de trabajo construidas y no pagadas,
Sol. Exh 58D........................................ ...$770,241.08

Cambio de criterio en la instalación, máximo
amperaje..............................................$1,249,630.00

Paralización al incorrectamente rechazarse la arena
compactada en las columnas de piedra......... $314,777.50

---

[33] Véase Ap., págs. 1304-1306.
[34] Véase Ap., pág. 1307.

Tiempo adicional en la obra causado por otros, incluyendo indecisiones, pruebas tardías, retrasos, detención ordenada por exigencias como equipo digital............... $1,251,218.3

Retenido y certificaciones adeudadas.............$969,720.74

Intereses al 6% acumulados desde agosto de 2006 al 10 de agosto de 2018 (doce años)..................$3,280,023.12

Honorarios de abogado...............................$1,779,207.00

Total......................................................... $9,614,817.75

El Comisionado determinó que el total antes indicado acumula intereses a razón del interés primario que publica el Wall Street Journal conforme fluctúe este de tiempo en tiempo hasta su total pago.

Pagos a los que **LPCD** tiene derecho que la AAA le efectúe son:
a) su reclamo por la arena dentro de las columnas de piedra.........................................................$184,046.55

b) intereses al 6% anual desde agosto de 2006 hasta el 10 de agosto de 2018 por el valor de la arena............$13,281.60[35]

c) el 100% de los arbitrios municipales (6%) de lo que se adeuda a Soletanche por obra realizada. No incluye los honorarios de abogado

d) el diferencial en precio unitario de los metros lineales de columnas de piedra dentro del grosor de la plataforma de trabajo $21.5775 X 12,897[28] m/l =..................$278,285.02

e) intereses al 6% anual desde agosto de 2006 hasta el 10 de agosto de 2018 por valor del metro lineal dentro de la plataforma de trabajo....................................$200,365.32

f) recobrar el principal de la cuantía que le ha sido retenida por la AAA (estipulada)................................$4,366,026.15

g) intereses al 6% anual desde agosto de 2006 hasta el 10 de agosto de 2018 por los dineros que la AAA retuvo a LPC&D......................................................$3,143,538.84

h) recobrar el 100% de los trabajos adicionales que se le adeudan a Soletanche, incluyendo turnos no productivos, incluye también los honorarios que no son por temeridad. Dicha cuantía es de $3,585,866.80 que corresponde a la suma de: columnas en espesor, plataformas, paralización de turnos de aparejo, paralización de compactación de arena, cambios de criterio a amperaje máximo..........$3,585,866.89

Total a pagar a LPC&D..............................$11,771,410.40

El Comisionado determina que el total antes indicado acumula intereses a razón del interés primario que publica el Wall Street Journal conforme fluctúe este de tiempo en tiempo hasta su total pago.

[…]

---

[35] Según surge de la *Resolución* dictada el 14 de julio de 2022 por el TPI, "[s]e admite un *error de forma* por lo que procede declarar **Ha Lugar** la solicitud de corrección *Nun Pro Tunc* del punto decimal en la página 89 del Informe del Comisionado, según dispone la Regla 49.1 de Procedimiento Civil (32 LPRA Ap. y). La suma debió ser $132,816.00." (Énfasis en el original). Véase, Ap., pág. 6828.

**Temeridad:**

[...]

El Comisionado toma en consideración el trámite del caso, su complejidad, volumen, costo y que conforme el contrato, a Soletanche, se le reembolsan los honorarios anteriormente indicados [e] incurridos hasta el final de las vistas, aunque los mismos patentemente continúan y continuarán. Se declara la temeridad de la AAA y se recomienda la imposición de honorarios a ser pagados por la AAA y CSA a Soletanche conjuntamente por la suma de quinientos mil dólares. Se recomienda imposición de honorarios a ser pagados por la AAA a Soletanche conjuntamente por la suma de quinientos mil dólares. Las anteriores, son imposiciones independientes no recobrables contra otras partes[36].

**CSA y Causa Interventora:**

[...]

La evaluación de los hechos establecidos por la evidencia, convencen al Comisionado, que siendo la AAA quien finalmente decide y habiendo decidido proceder como lo hizo, la cadena de causalidad quedó interrumpida y CSA no es responsable a Soletanche ni a LPC&D. En la eventualidad que CSA entienda y, el Tribunal as[í] lo determine, que tiene derecho al recobro de las costas y gastos de su parte, solo podrá, en dicha eventualidad, reclamar las mismas a la AAA.

Soletanche no será responsable por costas a parte alguna, ni por honorarios de abogado o ajuste o reducción al valor o contenido de la sentencia que en su favor se dicte. Tampoco lo son LPC&D ni CSA[.]

[...]

Así las cosas, el 6 de mayo de 2019, notificada al día siguiente, el TPI dictó *Sentencia*[37] en la cual adoptó en su totalidad el Informe del Comisionado, sin modificación alguna.

Ante ello, el 8 de mayo de 2019, Soletanche presentó un *Memorando de Costas*[38] ante el foro primario en el que reclamó la suma de $433,000.41 por concepto de costas. Por su parte, el 17 de mayo de 2019, LPC&D y las Fiadoras presentaron un *Memorando de Costas*[39] ante el TPI y solicitaron que se le ordene a la AAA reembolsar la suma de $243,270.09 por concepto de costas y $27,075.63 correspondientes al 25% de lo facturado por el Comisionado Especial a LPC&D.

---

[36] Véase Ap., pág. 1316.
[37] Véase Ap., págs. 1809-1816.
[38] Véase Ap., págs. 1817-1827.
[39] Véase Ap., págs. 1846-1848.

La AAA y LPC&D presentaron escritos en oposición al memorando de costas presentado por Soletanche el 20 y 22 de mayo de 2019, respectivamente. Además, el 22 de mayo de 2019, la AAA y LPC&D presentaron solicitudes de determinaciones de hechos y conclusiones de derecho adicionales y de reconsideración. El 28 de mayo de 2019, la AAA presentó su oposición al memorando de costas presentado por LPC&D y las Fiadoras.

Más adelante, el 5 de junio de 2019, notificada el 7 de junio de 2019, el TPI dictó una *Orden*[40] mediante la cual refirió cada una de las mociones postsentencia a la atención del Comisionado. Inconformes con la referida determinación, el 15 de agosto de 2019, la AAA acudió ante el Tribunal de Apelaciones mediante recurso de *Certiorari* con la designación alfanumérica KLCE201901101. Dicho foro determinó que la adjudicación de las mociones de reconsideración, determinaciones de hechos y conclusiones de derecho adicionales correspondía al TPI, y no al Comisionado[41].

Consecuentemente, el 10 de diciembre de 2019, notificada al día siguiente, el foro primario emitió una *Resolución e*n la que determinó, en lo pertinente, lo siguiente:

> 1) Memorando de Costas (presentado por Soletanche)- **Ha Lugar.**
>
> 2) Memorando de Costas (presentado por L.P.C. & D., Inc. (LPCD)- **Ha Lugar.**
> [...]
>
> 7) Moción de Reconsideración y en Solicitud de Determinaciones de Hechos y Conclusiones Adicionales (presentado por LPCD)- **No Ha Lugar.**
>
> 8) Solicitud de Determinaciones de Hechos y Conclusiones de Derecho Adicionales y Solicitud de Reconsideración (presentada por AAA)- **No Ha Lugar.**
> [...][42] (Énfasis en el original).

---

[40] Véase Ap., págs. 1947-1948.
[41] Véase *Sentencia* del Tribunal de Apelaciones emitida el 30 de septiembre de 2019 en el caso KLCE201901101.
[42] Véase Ap., págs. 6692-6695.

En desacuerdo nuevamente, las partes acuden ante el Tribunal de Apelaciones y le imputan al TPI la comisión de varios señalamientos de error. En esta ocasión, el 28 de febrero de 2020, el foro intermedio emitió una *Sentencia*[43] en la que determinó que las mociones postsentencia fueron atendidas antes de que el foro primario recibiera el mandato del Tribunal de Apelaciones, por lo que la Resolución del 10 de diciembre de 2019 fue dictada sin jurisdicción.

Así las cosas, el 14 de julio de 2022, el TPI emitió y notificó una *Resolución*[44] en la que consideró prudente reinstalar las determinaciones hechas en la Resolución dictada el 10 de diciembre de 2019. El foro primario concluyó que "las partes utilizaron estas mociones para presentar nuevos argumentos en sus solicitudes de reconsideración. Por entender que dichos argumentos han sido levantados a destiempo, no serán considerados en esta etapa de los procedimientos"[45].

Insatisfechos con la *Sentencia,* el 12 de agosto de 2022, LPC&D y las Fiadoras acudieron ante este Tribunal mediante un recurso de *Apelación* con la designación alfanumérica **KLAN202200633**, en el que señalaron que el foro primario incidió en lo siguiente:

> Primer error: Erró el TPI al declarar No Ha Lugar la solicitud de sentencia sumaria de LPC&D en base a la alegada existencia de controversias de derecho y no de hechos.
>
> Segundo error: Erró el TPI al dictar la Sentencia acogiendo el Informe y condenando a las Apelantes a pagar a Soletanche por las reclamaciones de Soletanche resultantes de condiciones de suelo diferentes a las anticipadas sin tomar en cuenta la cláusula sobre "changed conditions" del

---

[43] Véase *Sentencia* del Tribunal de Apelaciones, emitida el 28 de febrero de 2020 en el caso KLAN202000036, *et al.*, pág. 14-15. "Nótese que, el foro primario resolvió las referidas mociones, luego de haber recibido el mandato en el recurso de *certiorari* número KLCE201901101, el 5 de diciembre de 2019, pero antes de recibir el mandato de la *Sentencia* que estaba relacionado a los recursos de apelación número: KLAN201900932, KLAN201900933 y KLAN201900934". El mandato de la *Sentencia* de los referidos recursos de apelaciones fue emitido el 13 de diciembre de 2019.
[44] Véase Ap., págs. 6813-6830.
[45] Véase Ap., pág. 6827.

Subcontrato, la cual establecía una cláusula de "pay if paid", y por las reclamaciones de Soletanche por atrasos y daños ocasionados por la AAA y su equipo de trabajo y no por LPC&D.

Tercer error: Erró el TPI al dictar la Sentencia acogiendo el Informe y condenar a las apelantes a pagar a Soletanche por las reclamaciones de Soletanche por trabajo requerido por las especificaciones del Contrato pero no aprobado para pago por la AAA y el retenido sin tomar en cuenta la cláusula de "pay when paid" del Subcontrato.

Cuarto error: Erró el TPI al dictar la Sentencia acogiendo el Informe y declarando Con Lugar la reclamación de Soletanche por turnos estériles o detenidos.

Quinto error: Erró el TPI al dictar la Sentencia acogiendo el Informe sin reducir las cuantías adjudicadas a Soletanche por sus reclamaciones por turnos detenidos y no tomar en cuenta la cláusula de daños líquidos pactada en el Subcontrato.

Sexto error: Erró el TPI al dictar la Sentencia acogiendo el Informe concediendo a Soletanche sobre $1.7 millones en honorarios de abogado sin tomar en cuenta el carácter restrictivo del pacto entre LPC&D y Soletanche en el Subcontrato sobre el pago de honorarios de abogado y sin que Soletanche sometiera en evidencia las facturas correspondientes a más de $1.2 millones de los más de $1.7 millones reclamados por Soletanche.

Séptimo error: Erró el TPI al dictar la Sentencia acogiendo el Informe y condenar a las Fiadoras a pagar a Soletanche por las reclamaciones de Soletanche por daños por los atrasos en el Proyecto, las cuales no son por mano de obra o materiales puestos por Soletanche en el Proyecto.

Octavo error: Erró el TPI al dictar la Sentencia acogiendo el Informe y denegar las reclamaciones de Soletanche y LPC&D contra CSA bajo la teoría de que las acciones de la AAA constituyeron una causa interventora que liberó a CSA de responsabilidad.

Noveno error: Erró el TPI al dictar la Sentencia acogiendo el Informe y denegar implícitamente la Reconvención.

Décimo error: Erró el TPI al dictar la Sentencia acogiendo el Informe y determinar que la AAA y CSA fueron temerarios pero no imponerle[s] a éstas el pagar a LPC&D una suma razonable por concepto de honorarios de abogados por temeridad y al determinar que LPC&D y las Fiadoras fueron temerarias por LPC&D haber formulado su reconvención contra Soletanche.

Undécimo error: Erró el TPI al dictar la Sentencia acogiendo el Informe sin corregir los errores aritméticos contenidos en el mismo respecto a las cuantías adjudicadas a favor de LPC&D.

Duodécimo error: Erró el TPI al no hacer justicia y aplicar la equidad, incluyendo la doctrina de *rebus sic stantibus,* y resolver que, ante la aprobación de la Ley 3 del 2017 o cualquier ley similar aprobada posteriormente, LPC&D y las Fiadoras no tienen que pagar suma alguna a Soletanche hasta tanto la AAA no venga obligada a pagar las mismas a LPC&D o las Fiadoras.

El 12 de agosto de 2022, CSA compareció acudió ante este Tribunal mediante el recurso de *Apelación* con la designación alfanumérica **KLAN202200634** y esbozó los siguientes señalamientos de error:

Primero: Erró el TPI al acoger, sin base en la prueba, recomendaciones de determinaciones de hechos sugeridas por el Comisionado Especial que resultan incongruentes y aluden a actuaciones intencionales de CSA en perjuicio de terceros al ejecutar funciones como Gerente de Construcción de Obra.

Segundo: Erró el TPI al acoger del Informe del Comisionado Especial su conclusión de que CSA incurrió en temeridad.

Tercero: Erró el TPI y actuó irrazonablemente al acoger del Informe del Comisionado Especial su recomendación de imponer a CSA el pago de forma conjunta de una excesiva suma de honorarios de abogado por concepto de temeridad.

El 15 de agosto de 2022, la AAA acudió ante este Tribunal mediante el recurso de *Apelación* con la designación alfanumérica **KLAN202200643**, imputando que:

Primero: Erró el TPI al reconocer, reinstalar o mantener las determinaciones o decisiones de la resolución del 10 de diciembre de 2019, siendo esta una resolución nula e inexistente.

Segundo: La Sentencia apelada adolece de defectos que la hacen revocable: no se resolvieron todas las controversias planteadas; se omitieron estipulaciones de hechos que afectan su resultado; se omitió tomar conocimiento judicial de decisiones de este Foro.

Tercero: El TPI erró al ordenar en la Sentencia apelada que la AAA pague a Soletanche el "Retenido y certificaciones adeudadas" por la cantidad de $969,720.74, cuando la AAA ya pagó tales cantidades a LPCD.

Cuarto: El TPI erró en la imposición de intereses pre-sentencia a una tasa equivocada y desde una fecha errónea.

Quinto: El TPI erró en imponerle a la AAA el pago de los honorarios de abogados del subcontratista Soletanche, pactados por LPCD y Soletanche, pero no por la AAA.

Sexto: El TPI erró al resolver (acogiendo sin distinción el Informe del Comisionado en su totalidad) controversias inexistentes, ordenando que la AAA pague $3,585,866.80 a LPCD, cantidad no alegada ni reclamada por éste.

Séptimo: El TPI erró al decretar la temeridad de la AAA en la Sentencia apelada, adoptando la recomendación infundada del Comisionado en su Informe.

Octavo: El TPI erró al adoptar en su Sentencia la recomendación del Comisionado en cuanto a la imposición

de solidaridad de los demandados, pero contradictoriamente ordenar que únicamente es la AAA quien paga.

Noveno: El TPI erró en la aplicación del derecho relacionado al artículo 1489 del Código Civil, al omitir totalmente su aplicación y sustituirlo por la doctrina de equidad de *pass-through*, omitiendo las doctrinas prevalecientes en nuestra jurisdicción sobre la relatividad de los contratos y la figura de la subcontratación.

Décimo: El TPI erró en su Sentencia al no reconocer que, tanto LPCD como Soletanche, no cumplieron con los requisitos contractuales de notificación y certificación de sus reclamaciones.

Undécimo: El TPI erró al disponer que la AAA es responsable exclusivamente de la primera reclamación de Soletanche sobre el "pago del valor de las columnas dentro de la plataforma de trabajo construidas y no pagadas" omitiendo la clara evidencia presentada en contrario.

El 12 de septiembre de 2022, LPC&D y las fiadoras acudieron ante este Tribunal mediante el recurso de *Apelación* con la designación alfanumérica **KLAN202200726,** en el que señalaron que el foro primario incidió en lo siguiente:

Primer error: Erró el TPI al declarar Ha Lugar el memorando de costas de Soletanche en contrario a lo expresamente resuelto en el Informe acogido en la Sentencia a los efectos de que LPC&D no sería responsable por costas a parte alguna.

Segundo error: Erró el TPI al declarar Ha Lugar el memorando de costas de Soletanche en su totalidad y no excluir las partidas por gastos ordinarios de oficina de abogados.

Tercero error: Erró el TPI al declarar Ha Lugar el memorando de costas de Soletanche en su totalidad y no excluir las partidas por gastos de viaje de personas no testigos.

Cuarto: Erró el TPI al declarar Ha Lugar el memorando de costas de Soletanche en su totalidad y no excluir las partidas por gastos de honorarios de peritos.

El 12 de septiembre de 2022, la AAA compareció mediante *Petición de Certiorari* con la designación alfanumérica **KLCE202201012**, imputando que:

Primer error: Erró el Tribunal de Primera Instancia al reconocer, reinstalar o mantener las determinaciones o decisión de la resolución del 10 de diciembre de 2019, siendo esta una resolución nula e inexistente.

Segundo error: Erró el TPI al declarar Ha Lugar el Memorando de Costas a favor de las cuatro (4) Fiadoras cuando estas no fueron parte en la demanda Contra Copartes presentada solo por LPCD y por lo tanto no son partes prevalecientes.

Tercer error: Erró el TPI al declarar Ha Lugar el Memorando de Costas de las partes recurridas-codemandadas cuando los gastos reclamados claramente no son razonables ni necesarios para efectos de prevalecer en su posición y el mismo contiene partidas improcedentes bajo la jurisprudencia vigente. A su vez, LPCD incluye costas incurridas en proseguir su temeraria reconvención contra otra parte que no fue la AAA.

El 12 de septiembre de 2022, la AAA compareció mediante *Petición de Certiorari* con la designación alfanumérica **KLCE202201013**, en el que señaló que el foro primario incidió en lo siguiente:

Primer error: Erró el Tribunal de Primera Instancia al reconocer, reinstalar o mantener las determinaciones o decisión de la resolución del 10 de diciembre de 2019, siendo esta una resolución nula e inexistente.

Segundo error: Erró el TPI al declarar Ha Lugar el Memorando de Costas a favor de Soletanche y en contra de la AAA, ausente de un desglose de los costos reclamados vis a vis las diversas alegaciones entre las partes.

Tercer error: Erró el TPI al declarar Ha Lugar el Memorando de Costas de la parte recurrida-demandante cuando los gastos reclamados claramente no son razonables ni necesarios para efectos de prevalecer en su posición y el mismo contiene partidas improcedentes bajo la jurisprudencia vigente.

Con el beneficio de la comparecencia de todas las partes, así como la transcripción de la prueba oral, procedemos a resolver los recursos consolidados, de conformidad al estado de Derecho que dicta nuestro ordenamiento jurídico.

**II.**

**A. Deferencia judicial**

Es norma reiterada que, los tribunales apelativos no debemos intervenir con la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos de los tribunales de primera instancia[46]. Esta deferencia hacia el foro primario responde al hecho de que el juez sentenciador es el que tiene la oportunidad de recibir y apreciar toda la prueba oral presentada, de escuchar la

---

[46] *E.L.A. v. S.L.G. Negrón-Rodríguez,* 184 DPR 464, 486 (2012); *Serrano Muñoz v. Auxilio Mutuo,* 171 DPR 717, 741 (2007).

declaración de los testigos y evaluar su *demeanor* y confiabilidad[47].

Ahora bien, la doctrina de deferencia judicial no es de carácter absoluto, pues debe ceder ante las posibles injusticias que puedan acarrear unas determinaciones de hechos que no estén sustentadas por la prueba desfilada ante el foro primario. Se exceptúan de la regla de deferencia, las determinaciones de hechos que se apoyan exclusivamente en prueba documental o pericial, ya que los tribunales apelativos están en idéntica posición que el tribunal inferior al examinar ese tipo de prueba[48]. La apreciación de la prueba realizada por el TPI debe ser objeto de deferencia por los tribunales apelativos[49]. Como Regla general, no se intervendrá con la apreciación de la prueba, las determinaciones de hechos y las adjudicaciones de credibilidad que haga el foro de instancia[50].

En consideración a lo anterior, los tribunales apelativos deben brindarle gran deferencia al juzgador de los hechos, pues éste se encuentra en mejor posición para evaluar la credibilidad de un testigo y los conflictos de prueba deben ser resueltos por el foro primario[51].

No obstante, aunque el arbitrio del juzgador de los hechos es respetable y merece deferencia, no es absoluto y una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal. *Méndez de Rodríguez v. Morales Medina,* 142 DPR 26 (1996). Si un análisis integral de la prueba refleja que las conclusiones del tribunal *a quo* están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la

---

[47] *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67 (2009); *López v. Dr. Cañizares*, 163 DPR 119, 135 (2004).

[48] *González Hernández v. González Hernández*, 181 DPR 746, 776-777 (2011).

[49] *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894 (2011); *McConnell v. Palau,* 161 DPR 734 (2004).

[50] *Suárez Cáceres v. Com. Estatal Elecciones,* 176 DPR 31 (2009); *Trinidad García v. Chade,* 153 DPR 280 (2001).

[51] *S.L.G. Rivera Carrasquillo v. A.A.A.,* 177 DPR 345 (2009); *Ramírez Ferrer v. Conagra Foods P.R.,* 175 DPR 799 (2009).

evidencia recibida, éste ha cometido un error manifiesto[52]. Por lo tanto, en vista de dicha función revisora este Tribunal -por vía de excepción- puede intervenir con la apreciación de la prueba que ha hecho el foro de instancia cuando existe error manifiesto, prejuicio, parcialidad o pasión por parte del juzgador de los hechos[53].

De otro lado, es principio establecido que un tribunal apelativo está en la misma posición que el TPI en cuanto a la apreciación de prueba documental o pericial [54]. Por tanto, corresponde a la parte que impugna el peso de probar que el dictamen fue arbitrario, irrazonable o que se tomó en ausencia de evidencia sustancial, todo lo cual implicaría error manifiesto[55]. Es por ello por lo que en casos donde existe conflicto entre las pruebas, corresponde precisamente al tribunal de instancia dirimirlo[56].

En consecuencia, la intervención de un foro apelativo con la evaluación de la prueba testifical únicamente procede en casos en que un análisis integral de dicha prueba pueda causar en el ánimo del foro apelativo una insatisfacción o intranquilidad de conciencia tal que estremezca el sentido básico de justicia [57]. Los foros apelativos pueden dejar sin efecto las determinaciones de hechos realizadas por el foro de instancia, siempre que "del examen de la totalidad de la evidencia el Tribunal de revisión queda definitiva y firmemente convencido que un error ha sido cometido, como es el caso en que las conclusiones de hecho están en conflicto con el

---

[52] *Íd.* Véase también, *S.L.G. Rivera Carrasquillo v. A.A.A., supra*; *Ramírez Ferrer v. Conagra Foods P.R., supra.*

[53] *Rolón García v. Charlie Car Rental, Inc.*, 148 DPR 420 (1999); *López Vicil v. I.T.T. Intermedia, Inc.,* 142 DPR 857 (1997); *Pueblo v. Collado Justiniano,* 140 DPR 107 (1996).

[54] *Castrillo v. Maldonado,* 95 DPR 885 (1968).

[55] *Gallardo v. Petiton,* 132 DPR 39 (1992); *Henríquez v. C.E.S.,* 120 DPR 194 (1987)*; Rivera Pérez v. Cruz Corchado,* 119 DPR 8 (1987); *Quintana Tirado v. Longoria,* 112 DPR 276 (1982).

[56] *López Vicil v. ITT Intermedia, Inc., supra.*

[57] *Pueblo v. Cabán Torre*s, 117 DPR 645 (1986).

balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida"[58].

## B. Causa de acción al amparo del Art. 1489 del Código Civil

La causa de acción que reconoce el Artículo 1489 del Código Civil de Puerto Rico de 1930[59] a los materialistas y obreros está cimentada en consideraciones de orden público e índole moral, pues pretende propiciar el pronto pago a estos y evitar el enriquecimiento injusto del dueño de la obra y el empresario[60]. Esta causa de acción constituye una excepción al principio general del derecho de obligaciones, que establece que los contratos solo producen efecto entre los otorgantes y sus causahabientes[61].

El Artículo 1489 del Código Civil, dispone que los que ponen su trabajo y materiales en una obra ajustada alzadamente por el contratista, no tienen acción contra el dueño de ella sino hasta la cantidad que este adeude a aquel cuando se hace la reclamación. El antes referido artículo, concede a los obreros y materialistas una acción directa contra el comitente o dueño de la obra ante el incumplimiento de pago por parte del contratista. Sin embargo, dicha acción está limitada a la cuantía que el dueño de la obra le adeude al contratista al momento de la reclamación extrajudicial o judicial instada por estos[62].

Es decir, desde el momento que los obreros y materialistas ejercen la reclamación, el dueño de la obra se convierte en el deudor

---

[58] *Maryland Casualty Co. v. Quick Const. Corp.,* 90 DPR 329, 336 (1964).
[59] 31 LPRA ant. sec. 4130. El referido Código Civil de Puerto Rico de 1930, según enmendado, 31 LPRA ant. sec. 1 *et seq.,* fue derogado por el Código Civil de Puerto Rico de 2020, aprobado mediante la Ley Núm. 55 de 1 de junio de 2020, según enmendada, 31 LPRA sec. 5311 *et seq.* No obstante, para fines del presente caso, se hace referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable a la controversia ante nuestra consideración.
[60] *P.R. Wire Prod. v. C. Crespo & Asoc.,* 175 DPR 139, 147-150 (2008); *C. Armstrong e Hijos v. Díaz,* 95 DPR 819, 823-825 (1968).
[61] 31 LPRA ant. sec. 3374; *Goss, Inc. v. Dycrex Const. & Co., S.E.,* 141 DPR 342, 352-353 (1996); *R. Román & Cía. v. J. Negrón Crespo, Inc.,* 109 DPR 26, 29-31 (1979).
[62] *P.R. Wire Products, Inc., et als. v. C. Crespo & Asociados, Inc., supra; Goss, Inc. v. Dycrex Const. & Co., S.E., supra.*

de estos, y deja de serlo el contratista, hasta el punto de que los acreedores particulares de este no podrán concurrir con los obreros y materialistas en la suma debida por el dueño[63]. De modo que los obreros y materialistas "quedarían protegidos en caso de insolvencia o quiebra del contratista si, con anterioridad a dicho evento, hubiesen reclamado del dueño de la obra la cantidad que se les adeude"[64].

Ahora bien, la acción concedida por el Artículo 1489 del Código Civil, *supra*, no supone una modificación de la relación contractual entre comitente o dueño y contratista, y entre éste y los actores, ni su ejercicio implica la creación de una nueva relación sustantiva comitente-materialista u obreros[65]. Además, el materialista u obrero no adquiere ante el dueño de la obra más derechos de aquellos que tenía el contratista, por lo que el monto adeudado está sujeto a liquidación por razón de reajustes o posibles reclamaciones recíprocas que surjan entre el contratista y el dueño de la obra en relación con la misma[66].

### C. Contrato de arrendamiento de obras

Por otro lado, el contrato de obra o contrato de arrendamiento de obra o de ejecución de obra, o en este caso, el contrato de construcción es aquel en que una parte, típicamente identificado como el contratista, se compromete a realizar y entregar una obra o construcción según la misma fue contratada, mientras que la otra parte, el dueño, se obliga a pagar el precio convenido en la forma y el tiempo así pactado[67]. El contrato de arrendamiento de obras es uno de trabajo donde una de las partes hace una cosa para la otra, a cambio de un precio convenido por ambos. O sea, una parte se

---

[63] *Goss, Inc. v. Dycrex Const. & Co., S.E., supra,* pág. 352.
[64] *Íd.*
[65] *Román & Cía, Inc. v. J. Negrón Crespo, supra.*
[66] *Íd.*
[67] *Pacheco v. Estancias,* 160 DPR 409, 428 (2003); *Constructora Bauzá, Inc. v. García López,* 129 DPR 579, 592 (1991).

obliga a ejecutar una obra a cambio de la prestación convenida.[68] Este; tipo de contrato es uno de carácter consensual, bilateral y oneroso, cuyos elementos característicos son la obra a realizarse y el precio[69].

"El dueño de la obra tiene la obligación fundamental de pagar el precio de ésta en la forma, en la cuantía y en el tiempo convenido[70]. De no haber pacto o costumbre en contrario, el pago deberá hacerse al momento de la entrega de la obra[71]. El contratista, por su lado, tiene la obligación de realizar y entregar la obra según lo pactado. 'El contratista viene obligado a ejecutar la obra conforme a lo convenido en el contrato, a las reglas del arte de la construcción y a los usos o reglas profesionales'[72].

Generalmente, los contratos de obras o contratos de construcción entre partes privadas se rigen por las disposiciones del Código Civil,[73] y las obligaciones dispuestas en el propio contrato por las partes. No obstante, cuando una de las partes es una entidad gubernamental, los contratos de obras se rigen por disposiciones especiales, requisitos jurisprudenciales y los pliegos de la subasta o solicitud de propuestas. Como adelantáramos, los contratos de obra, como mínimo, han de ser por escrito, de cumplimiento prospectivo y remitidos a la Oficina del Contralor de Puerto Rico. Además, al ser un contrato de una obra pública, podría estar sujeta su ejecución a la legislación especial e incluso a reglamentación federal, si se realizara con la asignación de fondos federales.

El dueño de la obra o quien la contrata, tiene que pagar el precio pactado que, de ordinario es alzado, lo que implica que el

---

[68] 31 LPRA ant. sec. 4013; *Master Concrete Corp. v. Fraya, S.E.*, 152 DPR 616, 624 (2000).
[69] *Íd*; *Constructora Bauzá, Inc. v. García López, supra*, pág. 592.
[70] M. Albaladejo, *Derecho Civil*, 8va ed., Barcelona, Ed. Bosch, 1989, pág. 49.
[71] Art. 1491 del Código Civil, 31 LPRA ant. sec. 4132.
[72] Del Arco y Pons, op. cit., pág. 40." *Master Concrete Corp. v. Fraya, S.E., supra*, pág. 624.
[73] 31 LPRA ant. sec. 3371 a 31 LPRA ant. sec. 3525.

contratista asume los riesgos de su ejecución, pues estos están calculados e incluidos en el precio convenido. El Tribunal Supremo ha resuelto, por ello, que en "este tipo de contrato, para todo lo que presumiblemente estaba contemplado y previsto, y que debía preverse al momento de contratar, **el precio es definitivo y no puede ser aumentado en interés del empresario, aunque este pruebe que se perjudicó"**[74]. No obstante, es común en la industria de la construcción efectuar alteraciones a la obra pactada para llevar a cabo correcciones, disminuir costos, mejorar o ampliar el concepto original o cubrir necesidades no previstas por el dueño de la obra, entre innumerables razones.

El Tribunal Supremo reconoció que las órdenes de cambio pueden retrasar la conclusión de la obra, reducir o incrementar el costo de la construcción, lo que conlleva la reducción o el incremento del precio originalmente pactado[75]. En la Ley de Contratos de Obra Pública, Ley Núm. 388 de 9 de mayo de 1951[76], las propias órdenes y algunas comunicaciones entre las partes constituye un nuevo acuerdo que está sujeto a las características intrínsecas del contrato de obra a precio alzado y a la teoría de las obligaciones y contratos. **Esto implica que, al momento de pactar el cambio y fijar su nuevo costo, el contratista asume el riesgo de que la modificación pueda generar más o menos gastos, pero debe ejecutar el cambio como fue pactado. Resolver que un contratista pueda reclamarle al dueño de la obra los costos adicionales en los que incurrió al cumplir las órdenes de cambio, a pesar de que pactó el precio de la modificación, sería "[desvirtuar] la naturaleza del contrato de obras a precio alzado** y le concedería al contratista la facultad de renegociar los términos

---

[74] *Crufón Const. v. Aut. Edif. Púbs.*, 156 DPR 197, 210 (2002).
[75] *Levy v. Aut. Edif. Púbs.*, 135 DPR 382, 384 (1994).
[76] 22 LPRA secs. 41 y ss.

del contrato que pudo haber previsto, oportunamente, al momento de contratar"[77]. La base de este razonamiento se describe así en la opinión de *Levy v. Aut. Edif. Púbs.*, *supra*:

> Ciertamente, retrasos en el tiempo pactado originalmente en este tipo de obras son comunes en la industria de la construcción. "Las partes deben anticipar (no esperar) retrasos y contemplarlos en el contrato"[78]. (Traducción nuestra). "Los contratos de construcción están sujetos a muchos retrasos, por innumerables razones, y por los cuales la culpa podría ser difícil de adjudicar.... Los retrasos son generalmente previstos como probables; y los riesgos, por consiguiente, son descartados"[79]. (Traducción nuestra).

De ordinario, en la industria de la construcción se reconoce que, si un contratista firma una orden de cambio, acepta que la modificación del precio incluye todos los gastos asociados al cambio en la ejecución original de la obra, **por lo que renuncia al reclamo de los costos incurridos por causa del retraso a la obra**, que son los llamados "*extended overhead costs*". Además, los términos del contrato escrito o de la orden de cambio convenida son particularmente importantes al evaluar los méritos del reclamo del contratista por tales gastos.

Este principio de la industria, cuando se trata de contratos de obra pública, se añade a la exigencia legislativa y de interés público **de que han de constar por escrito las órdenes de cambio, así como cualquier derecho o facultad a reclamar los costos que surjan a causa de dicha orden o por la extensión del término de cumplimiento.** Señala la doctrina sobre ese dato en particular:

> Government contracting in Puerto Rico requires a budget allocation, a written agreement, and notice to the Comptroller within 15 days of the execution of the written agreement. Once the contractor submits his change order/proposal, he cannot commence work until he receives written authorization from the government and he is assured that there is a budget assignment covering the change order/proposal. [...] This presupposes that when a government agency or municipality is a party to a contract, or an amendment thereto, the contract or amendment must

---

[77] *Íd.*, págs. 210-211.

[78] *B.B. Bramble y M.T. Callahan, Construction Delay Claims, Nueva York, Ed. John Wiley & Sons,* 1987, Sec. 2.1, pág. 14.

[79] *3A Corbin on Contracts* Sec. 720, pág. 377 (1960); *Levy v. Aut. Edif. Púbs.*, 135 DPR, pág. 390.

be reduced to writing, executed by both parties, and registered with the Office of the Comptroller; otherwise, it is null and void. Our Supreme Court readily alluded to the efficacy of said statute in Fernandez & Gutierrez v. Municipio de San Juan, and added that it "reflects the legislative intent of creating a mechanism of checks and publicity of contracts executed by the municipalities, which is of a constitutive nature with respect to their efficacy." [...] Thus, there is considerable peril in performing change order/proposal work in a Puerto Rico Government contract in the absence of a written, registered modification to the contract. The performance of any such change order/proposal work without the written, registered modification to the contract is at the contractor"s own considerable risk[80].

### D. Contratación Gubernamental

La Constitución de Puerto Rico establece que "[so]lo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley"[81]. En virtud de este mandato constitucional, nuestro Tribunal Supremo ha sido consecuente al exigir el manejo ético y apropiado de los fondos públicos[82]. Asi pues y cumpliendo con el mandato constitucional [...] en miras de que "[l]a buena administración de un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa"[83].

En consecuencia, la facultad del Gobierno de Puerto Rico y de sus entidades para contratar y comprometer fondos públicos está limitada por estas normas. Ello, pues, por imperativo constitucional el Estado está obligado a manejar los fondos públicos con el mayor celo, amparado en los más altos principios éticos y fiduciarios[84]. Para cumplir con este mandato constitucional, la Legislatura ha

---

[80] *Weinstein Bacal & Parcés-Enríquez, supra*, págs. 66-69.
[81] Art. VI, Sec. 9, Const. PR., LPRA, Tomo 1, ed. 2016, pág. 444.
[82] *Vicar Builders v. ELA et al.,* 192 DPR 256 (2015); *Rodríguez Ramos et al. v. ELA et al.,* 190 DPR 448 (2014); *Jaap Corp. v. Depto. Estado et al.,* 187 DPR 730 (2013).
[83] *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 DPR 864, 871 (1990), *Génesis Security v. Depto. Trabajo*, 204 DPR 986, 997 (2020).
[84] *Jaap Corp. v. Departamento de Estado et al.,* 187 DPR 730, 739 (2013).

aprobado leyes especiales que imponen controles particulares sobre la contratación gubernamental[85]. Siendo ello así, conforme a las disposiciones del Código Civil establece, que un contrato entre una parte privada y el Estado que no cumpla con estas leyes será nulo e inexistente[86]. A su vez, el Tribunal Supremo ha determinado que:

> La rigurosidad de estos preceptos responde al gran interés del Estado en promover una sana y recta administración pública, mediante la prevención del despilfarro, la corrupción y el amiguismo en la contratación gubernamental[87].

> Además, el Tribunal Supremo ha señalado que, debido a la mayor rigurosidad que gobierna la contratación con los municipios y las agencias de gobierno, "se presume que las partes que así contratan ya conocen la necesidad de conducirse de acuerdo con las especificaciones de la ley"[88].

### E. El Contrato de Fianza de Construcción

El Artículo 1721 del Código Civil[89], establece que, mediante la fianza, una persona natural o jurídica se obliga a pagar o cumplir por un tercero, en caso de este no hacerlo. El citado artículo añade que, si el fiador se obliga solidariamente con el deudor principal, tenemos que referirnos a los artículos sobre obligaciones mancomunadas y/o solidarias de nuestro Código Civil[90].

La fianza se considera una garantía de carácter personal, cuyo propósito es asegurar la satisfacción del derecho de crédito que tiene un acreedor. El fiador prevé el riesgo de la insolvencia, parcial o total, del deudor. En ese sentido, ante la imposibilidad del deudor de cumplir con la obligación contraída, el acreedor puede acudir al patrimonio del fiador para hacer efectivo el cumplimiento de dicha obligación[91].

---

[85] *Íd.; Rodríguez Ramos v. ELA,* 190 DPR 448 (2014).
[86] 31 LPRA ant. sec. 3372.
[87] *Las Marías v. Municipio de San Juan,* 159 DPR 868, 875 (2003); *CMI Hospital v. Departamento de Salud,* 171 DPR 313, 230 (2007).
[88] *Íd., pág. 321; Hatton v. Municipio de Ponce,* 134 DPR 1001 (1994).
[89] 31 LPRA ant. sec. 4871.
[90] 31 LPRA ant. sec. 3103 a 3112.
[91] Carlos Lasarte, *Contratos, Principios de derecho civil III,* Ed. Marcial Pons, 13 ed., Madrid, 2010, pág. 402.

Cabe señalar que el contrato de fianza en Puerto Rico tiene como una de sus características ser una obligación accesoria a otra principal. La naturaleza accesoria de la fianza está plasmada en el Artículo 1742 del Código Civil[92], que dispone que la obligación del fiador se extingue al mismo tiempo que la del deudor y por las mismas causas de las demás obligaciones. La fianza implica la existencia de una obligación principal y de una accesoria que se pactó para garantizar el cumplimiento de la obligación principal. Esta se da entre acreedor y deudor y la accesoria se da entre fiador y acreedor para asegurar el pago o cumplimiento de la obligación del deudor.

La fianza puede constituirse como una obligación solidaria. En este contexto, la acción del acreedor contra el fiador es autónoma. Esta se puede ejercitar sin necesariamente llevar una acción contra el deudor[93]. Al respecto, al comentar el artículo 1822 del Código Civil Español, del cual el 1721 de nuestro Código es equivalente, dice Manresa lo siguiente:

> A pesar del carácter subsidiario de la obligación contraída por el fiador, que es lo que constituye una de las bases esenciales del contrato de fianza en su forma más común y corriente, puede perder, sin embargo, dicha condición, convirtiéndose en una obligación principal, si el fiador se obliga solidariamente con el deudor[94].

Por otra parte, el Artículo 1722 del derogado Código Civil de Puerto Rico[95], dispone específicamente que la fianza puede ser de tres (3) tipos: convencional, legal o judicial. Refiriéndonos, en particular, a las fianzas legales, se trata de aquellas que "se rigen en primera instancia por la ley que las crean y, en su defecto, por las disposiciones del Código Civil acerca de la fianza convencional en lo que les sea aplicable"[96]. Son fianzas exigidas por ley, para el

---

[92] 31 LPRA ant. sec. 4914.
[93] Luis Rafael Rivera Rivera, *El Contrato de Transacción: sus efectos en situaciones de solidaridad*, Jurídica Ed., San Juan, 1998, pág. 215.
[94] Manresa, *Comentarios el Código Civil*, tomo XII, Ed. 1931, pág. 155.
[95] 31 LPRA ant. sec. 4872.
[96] *Sucn. María Resto v. Ortiz*, 157 DPR 803, 812 (2002).

cumplimiento de obligaciones impuestas bajo el mismo, por lo que **la ley constituye parte del contrato de fianza** como si estuviera incorporada al mismo, debiendo interpretarse a la luz de dicho estatuto y a tenor con los propósitos del mismo[97]. Bajo una fianza legal, la obligación del fiador puede ser de carácter subsidiario, o convertirse en principal si se obliga solidariamente con el deudor[98].

Por otro lado, la Ley Núm. 388 de 9 de mayo de 1951, según enmendada, conocida como *Ley de la Fianza en los Contratos de Construcción, Reconstrucción, Ampliación o Alteración de una Obra Pública* (Ley Núm. 388-1951)[99], **regula lo que concierne a los contratos con entidades gubernamentales para la construcción de obras públicas**. Entre otras cosas, la Ley Núm. 388-1951 requiere que todo contratista de obra pública preste una fianza y también establece cual será la forma y términos de las fianzas de pago en los contratos de obra pública como sigue:

> La fianza antes mencionada será prestada por el contratista en efectivo, cheque certificado o con la garantía de una compañía fiadora autorizada para hacer negocios en Puerto Rico, y dicha fianza de pago garantizará mancomunada y solidariamente con el contratista, hasta el límite de responsabilidad de la fianza: (1) el pago a los obreros y empleados del contratista de los sueldos y jornales que devenguen en la obra, y (2) el pago, a las personas que vendan, suplan o entreguen equipo, herramientas y materiales para la obra, del precio o importe de los materiales, equipos y herramientas suplidos, vencidos o entregados. El monto de esta fianza de pago no será menor de la mitad del valor total del contrato, y de cualquier ampliación, extensión o adición a éste[100].

La fianza asegura al Estado por los daños que pudiera causarle el abandono de cualquier obra pública por parte del contratista y, a su vez, lo libera de cualquier reclamación directa por falta de pago de materiales o de la mano de obra. Es decir, no existe una acción en contra del dueño de la obra[101]. (la fianza tiene el

---

[97] *Pueblo v. Peñagarícano*, 54 DPR 613 (1939).
[98] *Colón v. White Star Bus Line, Inc.*, 63 DPR 344, 352 (1944).
[99] 22 LPRA sec. 47 *et seq.*
[100] 22 LPRA sec. 48.
[101] Véase 22 LPRA secs. 47 y 48; *Cristy & Sánchez v. E.L.A.,* 84 DPR 234, 238 (1961).

propósito de "librar al Estado de cualquier reclamación por la falta de pago de los materiales o la mano de obra"). Sin embargo, aquellos que hayan trabajado como obreros y empleados o que hayan suplido materiales, equipos o herramientas para la obra pueden instar una acción judicial, sin previa necesidad de notificación, contra el contratista y los fiadores del contratista[102]. (obreros y materialistas de una obra pública tienen una causa de acción contra la fianza prestada para hacer valer su crédito). Si bien los materialistas y subcontratistas no son parte del contrato de fianza que garantiza el contrato de obra, se estima que la obligación asumida por la compañía fiadora constituye una estipulación a favor de tercero por lo que tienen derecho a reclamar directamente a la fiadora[103].

Una fianza que garantice la construcción de cualquier obra pública responde al subcontratista [104] . **Sin embargo, un subcontratista o suplidor no adquiere ante el dueño de la obra más derechos que los que tenía el contratista**[105].

En cuanto a la interpretación de los contratos de fianza, el Tribunal Supremo ha dicho que estos deben ser interpretados liberalmente de modo que favorezcan las reclamaciones de los terceros beneficiados[106]. Sin embargo, **ello no autoriza a descartar los pactos y convenios entre las partes**, pues "la interpretación liberal o inclusiva de las fianzas no es carta blanca al Poder Judicial para descartar los pactos y convenios entre las partes[107]."

---

[102] 22 LPRA secs. 47-58; *Antonio Carro, Inc. v. Jura Const., Inc.*, 107 DPR 808 (1978).

[103] *A. L. Arzuaga, Inc. v. La Hood Const., Inc.*, 90 DPR 104, 117-118 (1964).

[104] *Montalvo & Comas Electric Corp. v. ELA,* 107 DPR 558, 561 (1978), citando a *Cristy & Sánchez v. E.L.A., supra.*

[105] *P.R. Wire Prod. v. C. Crespo & Asoc.,* 175 DPR 139, 149 (2008); *Goss, Inc. v. Dycrex Const. & Co., S.E., supra.*

[106] *Caguas Plumbing v. Continental Const. Corp.*, 155 DPR 744, 753 (2001), citando a *Cristy & Sánchez v. E.L.A., supra.*

[107] *Andamios de P.R. v. JPH Contractors, Corp.*, 179 DPR 503, 512 (2010) citando a *Mun. San Juan v. Stadium & Coliseum Opers.*, 113 DPR 490, 494 (1982).

**F. El Contrato de Transacción**

El Art. 1709 del Código Civil[108], define la transacción como "un contrato por el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen término al que había comenzado"[109]. Así, "toda transacción supone que las partes tienen dudas sobre la validez o corrección jurídica de sus respectivas pretensiones y optan por resolver dichas diferencias mediante mutuas concesiones"[110].

En cuanto al alcance de la transacción, el Art. 1714 del Código Civil[111], establece que comprende solo los objetos expresados en esta, "o [los] que por una inducción necesaria de sus palabras deban reputarse comprendidos en la misma". Asimismo, el citado artículo menciona que la renuncia general de los derechos aplica solamente con respecto a los que tienen relación con la disputa sobre la que ha recaído la transacción. Al interpretar este artículo, el Tribunal Supremo ha expresado que para saber cuáles son los efectos de un contrato de Transacción, se tiene que determinar qué fue lo que se pactó[112]. Así, debido a su naturaleza jurídica, los contratos de transacción deben interpretarse de forma restrictiva[113].

El contrato de transacción tiene que cumplir con los requisitos establecidos en el Artículo 1231 del Código Civil[114]. Es decir, tienen que concurrir el consentimiento, el objeto y la causa[115]. Sobre este particular, el Tribunal Supremo ha expresado que:

> Existe el consentimiento de los contratantes, ya que tiene que ser consensual; su objeto es la controversia entre las partes -la polémica judicial o extrajudicial- pues sin ella no puede existir la transacción; y su causa consiste en la

---

[108] 31 LPRA ant. sec. 4821.
[109] *Negrón Vélez v. ACT*, 196 DPR 489, 504 (2016).
[110] *Mun. de San Juan v. Prof. Research*, 171 DPR 219, 239 (2007).
[111] 31 LPRA ant. sec. 4826.
[112] *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 904 (2012).
[113] *Negrón Vélez v. ACT, supra*, págs. 505-506, citando a *Blás v. Hospital Guadalupe*, 167 DPR 439, 449-450 (2006); *Citibank v. Dependable Ins. Co., Inc.*, 121 DPR 503, 514 (1988).
[114] 31 LPRA ant. sec. 3391.
[115] *Negrón Vélez v. ACT, supra*, pág. 505; *Neca Mortg. Corp. v. A&W Dev. S.E.*, 137 DPR 860, 871 (1995).

eliminación de la controversia mediante recíprocas concesiones, pues si bien tiene el propósito de desaparecer un conflicto pendiente, se diferencia de otras figuras contractuales que tienen la misma finalidad, en que ello se logra mediante renuncias mutuas[116].

Ahora bien, además de cumplir con los requisitos esbozados en el Art. 1231 del Código Civil[117], el contrato de transacción tiene que incluir los siguientes elementos: "1) la existencia de una controversia o relación jurídica incierta litigiosa; 2) la intención de las partes de sustituir -mediante la transacción- la incertidumbre sobre los elementos objetivos de la relación jurídica por otra "cierta e incontestable"; 3) concesiones recíprocas"[118].

En relación con la interpretación de los contratos de transacción, en *Blás v. Hospital Guadalupe*, 167 DPR 439, 450 (2006), el Tribunal Supremo señaló lo siguiente:

> Es menester aclarar que la interpretación de los contratos de transacción también debe llevarse a cabo de acuerdo con las normas generales sobre la interpretación de contratos, mientras estas últimas no sean incompatibles con lo antes señalado. (Citas omitidas.) En virtud de estas normas generales, no deberán entenderse comprendidos en el contrato de transacción cosas distintas y casos diferentes de aquéllos sobre los que las partes se propusieron contratar. Art. 1235 del Código Civil. (Citas omitidas.) Igualmente, se estará al sentido literal de los términos de la transacción, si [e]stos son claros. Art. 1233 del Código Civil. Por último, para juzgar la intención de las partes, se debe atender principalmente a los actos de [e]stos, anteriores, coetáneos y posteriores al contrato, así como a cualquier otra circunstancia indicativa de sus voluntades[119].

### G. Teoría General de los Contratos

Dispone el derogado Código Civil de Puerto Rico, en su Artículo 1206, que "[e]l contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio[120]." También se concretiza cuando concurren los siguientes requisitos: consentimiento de los contratantes, el objeto cierto y la causa de la obligación[121]. Añade

---

[116] *Neca Mortg. Corp. v. A&W Dev. S.E.*, *supra*, pág. 871.
[117] 31 LPRA ant. sec. 3391.
[118] *Sagardía De Jesús v. Hosp. Aux. Mutuo,* 177 DPR 484, 498 (2009).
[119] Art. 1234 del Código Civil. (Citas omitidas.)
[120] 31 LPRA ant sec. 3371.
[121] 31 LPRA ant. sec. 3391.

que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes"[122]. En todo caso, "[l]os contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley"[123].

En Puerto Rico, además, rige el principio de la autonomía de la voluntad en todas las etapas de la contratación. Este principio le concede amplia libertad de acción a las partes que desean obligarse[124]. La aludida norma está recogida por el Artículo 1207 del derogado Código Civil, el cual dispone que "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público"[125]. Por otra parte, el Artículo 1233 del Código Civil[126], establece que, si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.

De igual modo, en torno a la interpretación de los contratos, nuestro ordenamiento civil establece que, "[s]i los términos de los contratos son claros y no dejan duda sobre la intención de los contratantes, se atenderá al sentido literal de sus cláusulas"[127]. De surgir controversia sobre "la voluntad o intención de los contratantes con la mera lectura literal de las cláusulas contractuales, deberá recurrirse a evidencia extrínseca para juzgarla, utilizando principalmente los actos anteriores, coetáneos y posteriores de los contratantes, el uso o costumbre y demás

---

[122] 31 LPRA ant. sec. 2994.
[123] 31 LPRA ant. sec. 3375.
[124] *BPPR v. Sucn. Talavera*, 174 DPR 686, 693 (2008).
[125] 31 LLPRA ant. sec. 3372; *Álvarez de Choudens v. Rivera Vázquez*, 165 DPR 1, 17 (2005); *Irizarry López v. García Cámara*, 155 DPR 713, 724 (2001).
[126] 31 LPRA ant. sec. 3471.
[127] 31 LPRA ant. sec. 3471.

circunstancias indicativas de la intención contractual, incluyendo la ocasión, las circunstancias, las personas y el acuerdo que se intentó llevar a cabo"[128].

### H. Intereses

La Regla 44.3 de Procedimiento Civil[129], regula los intereses que se imponen en las sentencias. La citada Regla que establece dos tipos de intereses legales. El primero es el interés postsentencia, al que tiene derecho toda parte que obtenga a su favor una sentencia y que ha de computarse sobre la cuantía de la sentencia desde el momento en que ésta se dicte hasta que sea satisfecha, con el objetivo de evitar "la posposición irrazonable en el cumplimiento de las obligaciones existentes y estimular el pago en el menor tiempo posible". El segundo es el interés presentencia que habrá de imponerse sobre la cuantía de la sentencia a la parte que haya procedido con temeridad. En casos de cobro de dinero, se computará desde que haya surgido la causa de acción hasta la fecha en que se dicte sentencia, y en casos de daños y perjuicios, desde la presentación de la demanda hasta la fecha en que se dicte sentencia, salvo aquellas excepciones que la misma regla dispone[130].

---

[128] 31 LPRA ant. secs. 3472 y 3477; Nissen *Holland v. Genthaller*, 172 DPR 503, 518-519 (2007), que cita a: *Municipio Mayagüez v. Lebrón*, 167 DPR 713 (2006); *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713 (2001).

[129] 32 LPRA Ap. V, R. 44.3 Regla 44.3; Interés legal. (32 LPRA Ap. V, R. 42.2) (a) Se incluirán intereses al tipo que fije por reglamento la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras, y que esté en vigor al momento de dictarse la sentencia, en toda sentencia que ordena el pago de dinero, a computarse sobre la cuantía de la sentencia desde la fecha en que se dictó la sentencia y hasta que ésta sea satisfecha, incluyendo las costas y honorarios de abogado. El tipo de interés se hará constar en la sentencia. La Junta fijará y revisará periódicamente la tasa de interés por sentencia, tomando en consideración el movimiento en el mercado y con el objetivo de desalentar la presentación de demandas frívolas, evitar la posposición irrazonable en el cumplimiento de las obligaciones existentes y estimular el pago de las sentencias en el menor tiempo posible.
(b) El tribunal también impondrá a la parte que haya procedido con temeridad el pago de interés al tipo que haya fijado la Junta en virtud del inciso (a) de esta regla y que esté en vigor al momento de dictarse la sentencia desde que haya surgido la causa de acción en todo caso de cobro de dinero y desde la presentación de la demanda, en caso de daños y perjuicios, y hasta la fecha en que se dicte sentencia a computarse sobre la cuantía de la sentencia, excepto cuando la parte demandada sea el Estado Libre Asociado de Puerto Rico, sus municipios, agencias, instrumentalidades o funcionarios(as) en su carácter oficial. El tipo de interés se hará constar en la sentencia.

[130] *Montañez López v. UPR*, 256 DPR 395, 424-425 (2002).

De acuerdo con el inciso (a), el interés post sentencia se le impone a la parte perdidosa en todas las sentencias que ordenen el pago de dinero, incluyendo las costas y honorarios de abogado, y se fija desde la fecha en que se dicta la sentencia hasta que se satisfaga[131]. La imposición de este tipo de interés es compulsoria[132]. Así pues, el interés post sentencia es parte integral de las sentencias dictadas y pueden cobrarse aun cuando nada se haya dispuesto en una sentencia[133].

En cuanto a la imposición del interés legal según el inciso (a) de la Regla 44.3 *supra,* "no hay duda de que, al Estado, sus agencias, instrumentalidades, departamentos, funcionarios públicos en su carácter oficial, corporaciones públicas y los municipios, les aplica el interés post sentencia al tipo que fije la Junta[134]."

Por otro lado, el interés legal impuesto en el inciso (b) de esta Regla 44.3, aplica al caso de un litigante perdidoso que actúa con temeridad[135]. Bajo nuestro ordenamiento procesal civil se sanciona la temeridad de un litigante perdidoso: (a) mediante la imposición del pago de honorarios de abogado bajo la Regla 44.1(d), antes transcrita, en todo tipo de acciones, pues dicha regla no hace excepciones, y (b) mediante la imposición de intereses al tipo legal, computados desde una fecha anterior a la de la sentencia, en dos clases de acciones, a saber, casos de cobro de dinero (se computan desde que surge la causa de acción) y casos de daños y perjuicios (se computan desde la presentación de la demanda)[136].

---

[131] *Gutiérrez v. A.A.A.,* 167 DPR 130, 136 (2006); Regla 44.3 (a), *supra; Malavé v. Oriental,* 167 DPR 593, 608 (2006).

[132] *Gutiérrez v. A.A.A., supra,* pág. 137.

[133] *Quiñones v. Manzano,* 141 DPR 139, 181 (1996).

[134] J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 2da. Ed., San Juan, Publicaciones JTS, 2011, T. IV, pág. 1328.

[135] *Colondrés Vélez v. Bayrón Vélez,* 114 DPR 833, 842 (1983).

[136] *Colondrés Vélez v. Bayrón Vélez, Íd.* a las págs. 842-843 (1983).

## I. Costas, Gastos y Honorarios de Abogado

En nuestro ordenamiento jurídico, la concesión de costas en el litigio está gobernada por la Regla 44.1 de las de Procedimiento Civil[137]. En lo pertinente, ésta dispone que "le serán concedidas a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación o revisión [...]"[138]. De acuerdo con la norma procesal, el criterio para que el tribunal decida cuáles partidas de las costas solicitadas concede, es que se trate de los "gastos incurridos necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que una parte litigante debe reembolsar a otra"[139].

La Regla también establece el procedimiento que se debe seguir para conceder las costas. En particular, el inciso (b) dispone que la parte reclamante tiene el término de diez (10) días, contados a partir de la notificación de la sentencia que le favorece, para presentar al tribunal, y notificar a la parte contraria, un memorando de costas[140]. El referido término de diez (10) días es de naturaleza jurisdiccional, tanto para presentar el memorando de costas como para notificar el mismo[141]. La naturaleza jurisdiccional del término para presentar y notificar un memorando de costas surge en virtud de la Regla 68.2 de Procedimiento Civil[142]. Por lo cual, este plazo es improrrogable y su cumplimiento tardío priva al tribunal de autoridad para considerar y aprobar las costas reclamadas[143].

Por último, la Regla 44.1 señala en el inciso (d), que en caso de que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia

---

[137] 32 LPRA Ap. V., R. 44.1.
[138] 32 LPRA Ap. V, R. 44.1.
[139] *Íd.*
[140] Regla 44.1(b) de las de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1.
[141] *Rosario Domínguez v. ELA*, 198 DPR 197 (2017); *Comisionado v. Presidenta*, 166 DPR 513, 518 (2005).
[142] 32 LPRA Ap. V., R. 68.2.
[143] *Rosario Domínguez v. ELA, supra.*

al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda que corresponde a tal conducta. Aunque el concepto temeridad no está expresamente definido por la Regla 44.1 (d) de Procedimiento Civil, se trata de una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia[144].

El propósito de este mecanismo es penalizar al que con su conducta ha obligado a la parte adversa en un litigio a incurrir en gastos y con ello le ha causado innecesariamente molestias e inconvenientes[145]. La imposición del pago de honorarios de abogado, de conformidad con la Regla 44.1, *supra,* depende de que el tribunal haga una determinación de temeridad.

Por último, "[l]a determinación de si un litigante ha procedido con temeridad descansa en la sana discreción del tribunal sentenciador"[146]. El tribunal impondrá la cuantía que el juzgador entienda que corresponde a la conducta temeraria[147]. Los criterios a evaluar al determinar si una parte litigante incurrió en temeridad son: (1) el grado de temeridad desplegada durante el litigio; (2) la naturaleza del procedimiento judicial; (3) los esfuerzos y la actividad profesional ejercida en el litigio; (4) la habilidad y reputación de los abogados[148].

Cónsono con lo anterior, reconocemos que de ordinario el ejercicio de las facultades discrecionales por el foro de primera instancia merece nuestra deferencia. Como corolario de lo anterior, sólo intervendremos con el ejercicio de dicha discreción en aquellas situaciones en que se demuestre que el foro recurrido: (1) actuó con

---

[144] *Fernández v. San Juan Cement Co., Inc.*, 118 DPR 713 (1987).
[145] *S.L.G. Flores-Jiménez v. Colberg*, 173 DPR 843, 867 (2008); *Rivera v. Tiendas Pitusa, Inc.*, 148 DPR 695, 702 (1999).
[146] *Raoca Plumbing v. Trans World*, 114 DPR 464, 468 (1983).
[147] *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 212 (2013); citando a *Andamios de PR v. Newport Bonding*, 179 DPR 503, 519-520 (2010).
[148] *Asociación de Condóminos v. Trelles Reyes*, 120 DPR 574, 579 (1988).

prejuicio o parcialidad; (2) incurrió en un craso abuso de discreción; o (3) se equivocó en la interpretación de cualquier norma procesal o de derecho sustantivo[149].

**III.**

Nos corresponde revisar la *Sentencia* emitida el 6 de mayo de 2019, notificada el 7 de mayo de 2019, por el TPI, la cual acoge en su totalidad el Informe del Comisionado. También, revisamos la *Resolución* emitida y notificada el 14 de julio de 2022 por el TPI mediante la cual decidió mantener la decisión dictada el 10 de diciembre de 2019 y declaró Ha Lugar el Memorando de Costas presentado por Soletanche y el Memorando de Costas presentado por LPC&D y las Fiadoras.

Reconocemos que, los foros apelativos, aceptamos como correctas, las determinaciones de hechos de los tribunales de instancia, al igual que su apreciación de los testigos y el valor probatorio de la prueba presentada en sala. Esta deferencia obedece a que las tareas de adjudicar credibilidad y determinar lo que realmente ocurrió, depende en gran medida de la exposición del juez o la jueza a la prueba presentada. Los jueces de instancia son los que tienen la oportunidad de ver el comportamiento de los testigos mientras ofrecen su testimonio y escuchar su voz[150].

No obstante, los tribunales apelativos podemos descartar las determinaciones de hechos del Tribunal de Primera Instancia, cuando el juzgador actuó con pasión, prejuicio o parcialidad, o incurrió en error manifiesto. La deferencia cede, cuando la totalidad de la evidencia analizada nos convence de que las conclusiones del

---

[149] *Rivera Durán v. Banco Popular*, 152 DPR 140 (2000).
[150] *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, 2022 TSPR 76; *Dávila Nieves v. Meléndez Marín, supra*, pág. 771.

TPI confligen con el balance más racional, justiciero y jurídico de toda la prueba recibida[151].

Conforme a esta doctrina este foro ha de intervenir debido que la determinación del TPI, así como el Informe del Comisionado, reflejan omisiones en la aplicación del derecho, lo que constituye un error manifiesto.

Expresado lo anterior y como cuestión de umbral, procedemos a atender de forma conjunta los errores en los recursos de LPC&D y AAA **KLAN202200633** y **KLAN20220643,** que arguyen aspectos procesales ante el TPI. Seguidamente, se discutirá el recurso **KLAN20220634**, sobre los errores que cuestionan la aplicación del derecho. Por último, abordaremos los recursos **KLAN202200726, KLCE202201012 y KLCE202201013** con los señalamientos de error sobre temeridad, intereses, honorarios y costas. Veamos.

**-A-**

En el recurso **KLAN202200633,** LPC&D y las Fiadoras señalan como **primer error**, que incidió el TPI al declarar No Ha Lugar la *Solicitud de Sentencia Sumaria Parcial* presentada por LPC&D a base a la alegada existencia de controversias de derecho y no de hechos.

Según surge del expediente ante nos, el 9 de agosto de 2012, LPC&D presentó la *Solicitud de Sentencia Sumaria Parcial.* El 31 de marzo de 2015, notificada el 6 de abril de 2015, el TPI emitió *Resolución*[152] en la que declaró No Ha Lugar la referida moción dispositiva por entender que había hechos esenciales en controversia. De las alegaciones de LPC&D y las Fiadoras con respecto a este asunto, no surge que el TPI haya incurrido en pasión, prejuicio, parcialidad o error manifiesto. Además, del expediente

---

[151] *Sucn. Rosado v. Acevedo Marrero,* 196 DPR 884, 917-918 (2016); *Dávila Nieves v. Meléndez Marín, supra,* pág. 771; *Rivera Menéndez v. Action Service,* 185 DPR 431, 444 (2012).
[152] Véase Ap., págs. 702-708.

tampoco surge que LPC&D haya solicitado reconsideración o recurrido oportunamente ante este Tribunal para impugnar lo resuelto por el TPI, por lo que el dictamen advino final y firme. **Así pues, este error no se cometió.**

En el **noveno señalamiento** de error, del KLAN202200633**,** LPD&D alegó que incidió el TPI al dictar Sentencia acogiendo el Informe del Comisionado y denegar implícitamente la Reconvención. De un examen del Informe emitido por el Comisionado Especial se desprende que este atendió la reconvención instada por la LPC&D. Específicamente, el Comisionado recomendó la desestimación con perjuicio de dicha reclamación, lo cual fue acogido por el TPI en su Sentencia [153].

Además, surge de los legajos que, el 3 de noviembre de 2008, notificada el 14 de noviembre de 2002, el TPI dictó *Sentencia Parcial* [154] en la que acogió la *Moción de Desistimiento Parcial* presentada por LPC&D y la AAA, en la cual informaron que el 17 de octubre de 2008 firmaron el Acuerdo en el cual se dispuso parcialmente la *Demanda Contra Copartes.* Fíjese que el Comisionado determinó en su Informe que:

> Conforme el documento transaccional entre AAA y LPC&D (Sol 63B) se restableció e incrementó la bonificación para alcanzar hitos tempranos en el progreso de obra (Págs. 7 y 8) se pactó las sumas de $810,000.00 y $310,000.00. Consecuentemente, LPC&D recuperó su derecho a la posibilidad de tener el bono por terminación temprana. <u>La reclamación de LPC&D contra Soletanche carece de mérito.</u> La AAA pagó a LPC&D $7,119.123.00 por razón de las reclamaciones transigidas[155]. (Subrayado nuestro).

Apuntalamos que, al revisar los recursos con sus correspondientes apéndices, colegimos que las alegaciones "a", "b", "c", "d" y "e" reclamadas por LPC&D en la *Reconvención Compulsoria*

---

[153] Véase Ap., págs. 1261, 1282, 1306 y 1307, Informe del Comisionado, determinaciones de hechos 132, 192, 193, 194, 195.
[154] Véase Ap., págs. 66-69. Además, surge que dicha *Sentencia Parcial* fue enmendada a petición de LPC&D y el foro primario la enmendó a través de la Sentencia Parcial Nunc Pro Tunc del 24 de noviembre de 2008, la cual fue debidamente notificada. Véase Ap., págs. 70-73.
[155] Véase Ap., pág. 1282, Informe del Comisionado, determinación de hecho 193.

ya fueron debidamente transadas mediante el Acuerdo, coincidimos con la apreciación del Comisionado. Por tanto, **el noveno error no fue cometido.**

El 15 de agosto de 2022, la AAA acudió ante este Tribunal mediante el recurso de Apelación con la designación alfanumérica **KLAN202200643**. Como **primer señalamiento de error**, le imputó al TPI haber cometido error al reconocer, reinstalar o mantener las determinaciones o decisiones de la Resolución del 10 de diciembre de 2019, siendo esta una resolución nula e inexistente. No es meritoria la contención de la AAA en cuanto a que la Resolución recurrida es improcedente por tratarse de un dictamen que, al fundamentarse en la Resolución del 10 de diciembre de 2019, la cual, según la AAA, se determinó que era nula, se le violentó el debido proceso de ley a este apelante. Lo anterior responde a lo que un panel hermano resolvió en una *Sentencia* del 28 de febrero de 2020. En aquel momento, este Tribunal de Apelaciones concluyó que la notificación de la Resolución del 10 de diciembre de 2019 fue nula, esbozando el siguiente fundamento:

> En fin, desde la fecha de la presentación de los tres recursos de apelaciones (KLAN201900932, KLAN201900933 y KLAN201900934) ante este foro revisor, el 21 de agosto de 2019, el Tribunal de Primera Instancia perdió jurisdicción para poder continuar con los procedimientos hasta tanto recibiera el mandato correspondiente. Como consecuencia, la notificación de la *Resolución* del 11 de diciembre de 2019 **resultó nula**. El Tribunal de Primera Instancia debió aguardar al recibo del mandato emitido el 13 de diciembre de 2019 por este Tribunal de Apelaciones para actuar. Una vez el foro primario recibiera el mandato, **procedía, entonces, notificar su determinación.** Solo así, comenzarían a decursar los términos para presentar el recurso ante este foro revisor[156]. (Énfasis nuestro).

Nótese que, en ningún momento este foro declaró nula la referida Resolución en sus méritos, sino más bien, la aludida determinación estuvo enfocada estrictamente en la notificación de ese dictamen. La consecuencia de que se haya emitido una

---

[156] Véase el caso KLAN202000036 consolidado con KLAN202000037, KLAN202000038, KLCE202000137 y KLCE202000139 en las págs. 15-16.

notificación nula o defectuosa afecta el aspecto procesal del caso en cuanto al establecimiento de los términos para recurrir a un foro apelativo, dado a la incertidumbre que se genera a la hora de tomar en consideración los términos para acudir a un tribunal de mayor jerarquía[157]. En vista del análisis que antecede, resolvemos que los errores formulados tanto por LPC&D como la AAA en cuanto la validez de la Resolución recurrida, no se cometieron por parte del TPI. Además, encontramos que el foro primario atendió las mociones presentadas por las partes conforme al mandato del Tribunal de Apelaciones. En consecuencia, concluimos que **no se cometió el error señalado.**

En su **segundo señalamiento de error**, la AAA adujo que la Sentencia apelada adolece de defectos que la hacen revocable, a saber: no se resolvieron todas las controversias planteadas; se omitieron estipulaciones de hechos que afectan su resultado; se omitió tomar conocimiento judicial de decisiones de este Foro.

De un examen de la Sentencia apelada a la luz de la totalidad del expediente, disponemos que todos planteamientos presentados por las partes fueron atendidos por el foro primario. Este tribunal analizó las múltiples mociones, reclamaciones y estipulaciones incluidas en el legajo, por lo que determinamos que el TPI atendió la totalidad de las controversias ante su consideración. **Este error no fue cometido.**

Mediante el **décimo señalamiento de error**, la AAA expuso que cometió error el TPI al no reconocer que, tanto LPC&D[158] como Soletanche, no cumplieron con los requisitos contractuales de notificación y certificación de sus reclamaciones. **Este error se cometió**, no surge en el legajo apelativo, que se hubiese cumplido

---

[157] *Plan Salud Union v. Seaboard Sur. Co.,* 182 DPR 714, 723 (2011).
[158] Incluye la reclamación de LPC&D en la *Demanda contra Coparte* sobre reclamo por arena dentro de las columnas de piedra.

con la Condiciones Generales establecidas en el contrato entre la AAA y LPC&D, relacionada con la notificación de órdenes de cambio y disputas[159]. Adelantamos que al determinar que se cometió este error, el mismo incide en la aplicación del derecho y la responsabilidad y obligación de pago. Veamos.

**-B-**

A continuación, atenderemos los señalamientos de error **tercero, sexto, octavo, noveno, décimo, undécimo KLAN202200643** todos relacionados con la aplicación incorrecta del derecho lo cual incide en la responsabilidad de pago.

Recordemos que la parte que impugna una decisión del foro primario tiene la obligación de demostrar la incorrección de las determinaciones de hechos o la aplicación incorrecta del derecho. En el caso de autos, la AAA ha cumplido con el estándar requerido y ha demostrado que la norma jurídica aplicable en esta controversia fue obviada tanto por el TPI como por el Comisionado. Dicho lo anterior, existen circunstancias extraordinarias que demuestran que el TPI cometió un error manifiesto en la aplicación del derecho por lo cual se requiere nuestra intervención.

Puntualizamos que para el 2005, la AAA era dueña del Proyecto objeto de esta controversia y para realizar la obra de construcción la AAA y LPC&D suscribieron un contrato de obra pública por la suma de $103,632,270.00[160]. Posteriormente, LPC&D y Soletanche suscribieron un subcontrato de $8,130,000.00[161].

Así pues, la relación de la AAA y LPC&D giraba en torno a un contrato de obra pública. La AAA firmó un contrato con CSA como gerente de construcción del proyecto[162]. Ante este escenario jurídico

---

[159] Véase Ap., págs. 2359-2375.
[160] Véase Ap., págs. 2344-2350.
[161] Véase, Ap., pág. 1234, Informe del Comisionado, determinación de hechos 23.
[162] Véase Ap., págs. 1232 y 1254, Informe del Comisionado, determinaciones de hechos 8 y 108.

Soletanche no tenía ninguna relación contractual con la AAA, por lo cual, y conforme con el ordenamiento jurídico, la única reclamación fáctica permisible es presentar una *Demanda* a base del Art. 1489 del Código Civil[163], lo cual hizo el 26 de diciembre de 2006.

Es norma reiterada que al activarse el Art. 1489 del Código Civil, *supra*, el verdadero acreedor del remanente del precio adeudado al contratista es el obrero o materialista reclamante. El contratista deja entonces de ser acreedor del dueño de la obra. Cualquier pago retenido del precio de la obra no ha de hacerse a esta persona, sino al materialista u obrero demandante, nuevos acreedores de ese remanente[164]. En el caso de autos, la AAA tiene un retenido por la cantidad de $4,366,026.15.

La AAA alega en su **tercer error señalado**, que incidió el TPI al ordenar en la Sentencia apelada que la AAA pague a Soletanche el "retenido y certificaciones adeudadas" por la cantidad de $969,720.74, y además devuelva a LPC&D la totalidad del retenido, lo cual constituye un doble pago y se aleja de la norma establecida del citado Art. 1489 del Código Civil, *supra*. Por otro lado, la AAA esboza en su **noveno señalamiento de error**, que erró el TPI en la aplicación del derecho relacionado al Artículo 1489 del Código Civil, *supra,* al omitir totalmente su aplicación y sustituirlo por la doctrina de equidad de *pass-through*, omitiendo las doctrinas prevalecientes en nuestra jurisdicción sobre la relatividad de los contratos y la figura de la subcontratación.

Al examinar la Sentencia y el Informe del Comisionado no cabe duda de que incidió el foro primario en no aplicar la normativa del Art. 1489 del Código Civil, *supra*. Conforme a dicho artículo el dueño de la obra responderá hasta la cantidad que este adeude al

---

[163] 31 LPRA ant. sec. 4130.
[164] *Goss, Inc. v. Dyrex Const. & Co., S.E.*, *supra,* a la pág. 342.

contratista por lo cual pagar a Soletanche y la pretender nuevamente pagar el retenido a LPC&D, es errada. Ante ello, **el tercer y noveno error señalado en el KLAN20220643 fueron cometidos.**

La AAA en su **sexto señalamiento de error**, nos invita a analizar y aplicar la normativa del Art. 1489 del Código Civil, *supra.* Arguye que erró el TPI al acoger el Informe del Comisionado y ordenar que la AAA pague la suma de $3,585,866.80 a LPC&D. El inciso impugnado dispone como sigue:

> *Pagos a los que **LPCD** tiene derecho que la AAA le efectúe:*
>
> *h) recobrar el 100% de los trabajos adicionales que se le adeudan a Soletanche, incluyendo turnos no productivos, incluye también los honorarios que no son por temeridad. Dicha cuantía es de $3,585,866.80 que corresponde a la suma de: columnas en espesor, plataformas, paralización de turnos de aparejo, paralización de compactación de arena, cambios de criterio a amperaje máximo………$3,585,866.89[165].*

Antes de proceder con análisis y aplicación del Art. 1489 del Código Civil a la situación de hechos que está ante nuestra consideración, especificamos que LPC&D presentó *Demanda Contra Copartes* y en la segunda causa de acción en los incisos "c", "d" y "e" reclamó a favor de Soletanche por la cantidad de $2,793,227.28. No obstante, la cantidad otorgada por el Comisionado referente a esta partida excede a la reclamación que realizó LPC&D en la Demanda Contra Copartes. Los $3,585,866.80 concedidos por el Comisionado equivalen a la suma de las alegaciones "a", "b", "c", y "d", de la *Demanda* instada por Soletanche. Así pues, coincidimos con el señalamiento realizado por la AAA en cuanto a que la cantidad concedida no fue alegada por LPC&D.

Ahora, retomando la aplicación del Art. 1489 del Código Civil, el Tribunal Supremo ha determinado que "el contratista deja entonces de ser acreedor del dueño de la obra y cualquier pago

---

[165] Véase Ap., pág. 1314.

retenido del precio de la obra no ha de hacerse a esta persona, sino al materialista u obrero demandante, nuevos acreedores de ese remanente"[166].

Cónsono con lo anterior cuando Soletanche presenta la *Demanda* contra la AAA, activó la reclamación bajo los parámetros del Art. 1489 del Código Civil. La norma reiterada sobre el citado artículo es que, **los obreros, subcontratistas y materialistas pueden hacer efectivo su crédito contra el dueño de la obra**, aun cuando no intervinieron en el contrato original ni exista una relación contractual directa con él. **El remedio que brinda el Art. 1489 constituye, pues, una excepción al principio de la relatividad de los contratos**, que establece que los contratos tienen efecto únicamente entre los otorgantes y sus causahabientes[167]. Por consiguiente, al aplicar la doctrina adoptada por el Tribunal Supremo y al activarse el Art. 1489 del Código Civil, el verdadero acreedor del remanente del precio adeudado al contratista es el obrero o materialista reclamante.

Por tanto, la segunda acción inciso "c", "d" y "e" de la *Demanda Contra Copartes* instada por LPC&D a favor de Soletanche es totalmente inoficiosa e improcedente en derecho, por lo cual la damos por no puesta y no procede la concesión de algún remedio. Así pues, determinamos, que **el sexto señalamiento de error en el recurso KLAN20220643 fue cometido.** Por lo cual**, <u>procede revocar y eliminar la partida de $3,585,866.80 concedida por el Comisionado en su inciso "h" a favor de LPC&D y acogida por el TPI, esto por ser inconsistente con el Art. 1489 del Código Civil</u>**[168].

---

[166] *Goss, Inc. v. Dyrex Const. & Co., S.E., supra,* a la pág. 342.
[167] 31 LPRA ant. sec. 3374; *R. Román & Cía. v. J. Negrón Crespo, Inc.,* 109 DPR 26 (1979); *Junco Steel Corp. v. C.E. Design Dev.,* 148 DPR 272, 277 (1999).
[168] 31 LPRA ant. sec. 4130.

Por otro lado, la AAA esboza en su **noveno señalamiento de error** que incidió el Comisionado y, por consiguiente, el TPI en la Sentencia impugnada al conceder la partida "f", la cual dispone lo siguiente:

*Pagos a los que **LPCD** tiene derecho que la AAA le efectúe:*

**f. recobrar el principal de la cuantía que le ha sido retenida por la AAA (estipulada) $4,366,026.15, concedida a favor de LPC&D**[169].

La AAA alega que el TPI intencionalmente erró al no aplicar el Art. 1489 del Código Civil y al ordenar el pago del retenido por la cantidad de $4,366,026.15. Como adelantamos, le asiste la razón a la AAA. Es norma conocida que, el retenido se utiliza en primer lugar para pagar a **los obreros, subcontratistas y materialistas pueden hacer efectivo su crédito contra el dueño de la obra**, en este caso a Soletanche. Por tanto, el TPI no puede imponerle al dueño de la obra un doble pago, porque la controversia a resolver se rige por el Art. 1489, el cual establece que los obreros y materialistas son los que tienen derecho a cobrar al dueño de la obra. Le asiste la razón a la AAA.

Colegimos, que **el noveno error fue cometido.** Por lo cual**, <u>procede revocar y eliminar la partida mencionada en el inciso "f" del Informe del Comisionado la cual concede $4,366,026.15 a favor de LPC&D este inciso es inconsistente con el Art. 1489 del Código Civil</u>**.

En el **octavo señalamiento de error** del **KLAN202200643,** la AAA adujo que erró el TPI al adoptar en su Sentencia la recomendación del Comisionado en cuanto a la imposición de solidaridad de los demandados, pero contradictoriamente ordenar que únicamente es la AAA quien paga. Debemos recordar que en nuestro ordenamiento jurídico la solidaridad no se presume, ni

---

[169] Véase Ap., pág. 1314.

existe a menos que expresamente se convenga. Del expediente se desprende que la AAA nunca pactó la solidaridad que ahora pretende adjudicarle el Comisionado y, a su vez, el foro primario en la Sentencia impugnada. Por ello, el Art. 1090 del Código Civil de Puerto Rico[170], establece que sólo habrá solidaridad "[...] cuando la obligación expresamente lo determine [...]". De modo que, una obligación es solidaria cuando así se haga constar expresamente[171]. Ante ello, **es forzoso concluir que el error fue cometido. En este caso no aplica la solidaridad**.

La AAA argumenta en **sus errores décimo y undécimo** del **KLAN20220643** que no son responsables del pago de las reclamaciones "a", "b", "c" y "d" de la demanda porque tanto LPC&D como Soletanche incumplieron con las Condiciones Generales del contrato de la obra pública firmado entre LPC&D y AAA, en específico obviaron todo el proceso de notificación y certificación, y los trabajos reclamados no eran requeridos. Alega la AAA que hubo prueba en contrario sobre estas alegaciones. Veamos.

Soletanche en su demanda, solicita el pago de 5 reclamaciones. A este foro le corresponde revisar si las determinaciones de la Sentencia sobre la adjudicación de cada una de las reclamaciones fueron conforme a derecho. Las reclamaciones de la demanda son las siguientes:

| | |
|---|---|
| a) Largo de columnas construidos e instalados y no pagados | $770,241.08 |
| b) Cambios en los criterios de compactación de la piedra, incrementando el diámetro de las columnas | $1,103,020.31 |
| c) Detención en la compactación de las puntas de arena de los pilotes | $314,777.50 |
| d) Conforme contrato, tiempo de turnos estáticos y estériles por retrasos causados por otros | $1,215,218.31 |

[170] 31 LPRA ant. sec. 3101.
[171] *García Pérez v. Corp. Serv. Mujer,* 174 DPR 138 (2008).

| e) Trabajo certificado y adeudado desde al menos mayo de 2006 | $962,768.95 |
|---|---|
| Total reclamado: | $4,366,026.15 |

Luego de examinar el extenso expediente apelativo, las reclamaciones "a", "b" y "c" están relacionadas con cambios de condiciones. Según surge del Informe del Comisionado, existe abundante prueba testifical que demuestra fehaciente que ocurrieron los cambios en las condiciones representadas del Proyecto, en particular en la especificación 02225/b[172].

No obstante, en *Levy v. Aut. Edif. Púbs., supra*, el Tribunal Supremo reconoció que las órdenes de cambio pueden retrasar la conclusión de la obra, reducir o incrementar el costo de la construcción, lo que conlleva la reducción o el incremento del precio originalmente pactado. En estos casos, cada orden de cambio constituye un nuevo acuerdo que está sujeto a las características intrínsecas del contrato de obra a precio alzado y a la teoría de las obligaciones y contratos.

Sobre las ordenes de cambio, la Oficina del Contralor del Gobierno de Puerto Rico ha expresado que "[l]os cambios relacionados con el proyecto y el contrato otorgado se pueden efectuar mediante una enmienda escrita, orden de cambio u orden de campo[173]. En cuanto a la Orden de Cambio, la misma es definida como:

> una orden escrita emitida por el dueño de la obra o su representante, dirigida al contratista y firmada por ambas partes, que cubre adiciones, cancelaciones o revisiones en la obra, o ajustes en el precio y en el tiempo del contrato. [Artículo 1.1.1.9 del *Uniform General Conditions*][174].

Aun cuando en el caso de autos no aplica el reglamento *Uniform General Conditions for Public Works Contracts in Puerto*

---

[172] Véase Informe del Comisionado, determinaciones de hecho 121, 146-155.
[173] Véase, *Aspectos a considerar en las distintas etapas de los proyectos de construcción de obras públicas y mejoras permanentes*, Folleto Informativo 2020, Oficina del Contralor del Estado Libre Asociado de Puerto Rico, pág. 21.
[174] *Íd.*

*Rico*[175], por ser un documento posterior a la fecha de contratación entre la AAA y LPC&D, surge del expediente apelativo que sí existió un documento titulado *General Conditions For The Rio Blanco Offstream Reservoir and Intake Facilities Naguabo, Puerto Rico* (Condiciones Generales)[176], el cual sirve como guía para establecer los términos y condiciones contractuales entre el Gobierno de Puerto Rico y todos los participantes del proceso de la construcción. Colegimos que, el incumplimiento de las Condiciones Generales y las formalidades de las leyes incide en alejarse del fin último de proteger los mejores intereses de la entidad gubernamental y los fondos públicos.

Surge que la AAA tenía estructurado en el contrato un mecanismo de aprobación mutua de las órdenes de cambio, y el reclamo de aumento de costo en la obra se procesaba en tales órdenes y quedaba aprobada al firmarse por las partes[177]. Conforme

---

[175] Reglamento 7998 aprobado el 3 de marzo de 2011 por el del Departamento de Transportación y Obras Públicas.

[176] Véase Ap., pág. 2359.

[177] Véase Ap., págs. 963-968. Transcripción de las Definiciones de las Condiciones Generales:

17. *Claim* - A written demand or protest by the Contractor asserted prior to Final Payment, seeking an adjustment of the Contract Price or the Contract Time pursuant to the provisions of the Contract Documents.

18. *Claim Determination* - A written determination issued by the Contracting Officer to the Contractor setting forth PRASA's position with respect to a Claim, subject to and in accordance with the provisions of Subsection 5.11.4– Claim Resolution.

19. *Claim Submission* - As defined in the definition of Contractor Certification contained in this Definitions.

31. *Contractor Certification* – A notarized affidavit signed by the Contractor's Project Director or the Contractor's Project Manager certifying, with respect to a Contractor Change Request, a Contractor Change Proposal, or a notice given under the provisions of Subsection 5.12.4 – Notice and Procedures as to Delay Events (each a "Claim Submission"), that he or she has personally reviewed the documentation submitted in support of the Claim Submission, that he or she is satisfied that the Claim Submission is true, accurate and complete, that the dollar amounts and time extensions claimed accurately reflect the adjustments in the Contract Price or the Contract Time for which the Contractor reasonably believes PRASA is liable under the terms and conditions of the Contract, and that the Claim Submission is made in good faith.

[...]

El artículo 5 de las Condiciones Generales, titulado "Amendments, Changes,

con la prueba presentada, ese proceso no se cumplió por LPC&D. En fin, no se demostró de manera alguna que no se hubiera seguido el proceso adecuado para la aprobación de los cambios de órdenes. No se ha citado autoridad alguna ni se ha demostrado que la cláusula contractual en controversia permita la erogación de fondos públicos obviando los procedimientos establecidos en las condiciones generales que constan en el contrato entre la AAA y LPC&D.

**Por consiguiente, los errores décimo y undécimo del recurso KLAN20220643 no fueron cometidos.** Determinamos que la AAA no responde por las alegaciones "a", "b", "c" y "d" de la demanda presentada por Soletanche. Procede eliminar esa partida de la Sentencia impugnada[178]. **Esto implica que, la única partida por la que AAA es responsable de pago es el inciso "e" de la demanda de Soletanche por trabajo certificado y adeudado**

---

Delays and Time Extensions" está subdividido en trece (13) secciones. La sección 5.07, titulada "Changes Requested by the Contractor", dispone en parte:

**Subsection 5.07.1 – Contractor Change Requests**

The Contractor may initiate a request for a Change in the Work by submission to PRASA's Representative of a Contractor Change Request. Except for Change Orders or Change Directives initiated pursuant to Section 5.04 – Change Order and Section 5.05 – Change Directives, **the Contractor shall not be entitled to any adjustment of the Contract Price or the Contract Time as a result of any statement, direction, action or failure to act by PRASA's Representative, the Contracting Officer or PRASA, the happening of any event or occurrence, or any other cause, including a change in Applicable Laws after the date of submission of the final Contractor Bid, unless, subject to the terms of the Contract Documents, the Contractor shall have first submitted to PRASA's Representative a Contractor Change Request, as hereinafter specified, and shall have complied with the other applicable requirements of the Contract.** If the Contractor believes that it is entitled to adjust the Contract Price or the Contract Time, or otherwise modify the terms of the Contract Documents, **the Contractor must submit to PRASA's Representative a Contractor Change Request, in accordance with the time periods and procedures set forth in Subsection 5.07.1- Contractor Change Requests, containing, at a minimum, the information required to be included in a Contractor Change Proposal, as described in Section 5.06** – Contractor Change Proposal. (Énfasis en el original).

[178] Vease *Levy v. Aut. Edif. Púbs* 135 DPR 382, 384 (1994) *Resolver que un contratista pueda reclamarle al dueño de la obra los costos adicionales en los que incurrió al cumplir las órdenes de cambio, a pesar de que pactó el precio de la modificación, sería "[desvirtuar] la naturaleza del contrato de obras a precio alzado y le concedería al contratista la facultad de renegociar los términos del contrato que pudo haber previsto, oportunamente, al momento de contratar*[178]".

**desde al menos mayo de 2006 $962,768.95.** La concesión de intereses la discutiremos más adelante.

**-C-**

Por estar estrechamente relacionados, el **segundo y tercer señalamiento de error** del recurso **KLAN202200633** serán discutidos de forma conjunta, al igual que lo hicieran LPC&D y las Fiadoras. En esencia, aducen que erró el TPI al dictar la Sentencia en la cual acogió el Informe del Comisionado y condenó a LPC&D y las Fiadoras a pagar a Soletanche por las reclamaciones sin tomar en cuenta la cláusula sobre *"pay if paid"* y *"pay when paid"* contenida en el subcontrato.

Sobre la reclamación de Soletanche por trabajos requeridos por las especificaciones, pero no pagadas o ni aprobadas por la AAA, particularmente por lo retenido y la instalación de las columnas de piedra a través de la plataforma de trabajo, LPC&D adujo que bajo la cláusula de *"pay when paid"* expresa en el subcontrato LPC&D venía obligada a pagar a Soletanche dentro de los 7 días de la AAA haber pagado a LPC&D, pero no más tarde de los 60 días de la AAA haber aprobado para pago la certificación para pago de LPC&D[179] conteniendo los trabajos facturados por Soletanche. Afirmó que la intención de las partes respecto a dicha cláusula era que LPC&D pagara a Soletanche solo de recibir el pago de la AAA, siempre y cuando la causa de la falta de pago por la AAA a LPC&D no fuera atribuible a LPC&D.

En cuanto a las reclamaciones por condiciones de suelo distintas a las anticipadas, a saber, las reclamaciones por el cambio en el criterio de compactación de la piedra de las columnas, la detención en la instalación de las columnas de piedra y la

---

[179] Véase Ap., pág. 641; Informe Conferencia con Antelación a Juicio, febrero 2015, estipulación de hecho 38.

reclamación por los turnos estériles o detenidos, LPC&D arguyó que el subcontrato contenía una cláusula de "*pay if paid*" o relevo a LPC&D de tener que responder a Soletanche por las mismas, salvo que la AAA pagara a LPC&D por ellas.

En este caso, estamos ante una cadena de contratación. La AAA es la dueña de la obra, quien contrató a LPC&D como contratista principal del Proyecto, y Soletanche es subcontratada por LPC&D. Al examinar los contratos, se desprende que Soletanche y LPC&D, en efecto, pactaron una cláusula sobre los términos específicos sobre pago[180].

Luego de examinar el contenido del contrato entre LPC&D y Soletanche, determinamos que las cláusulas son claras y establecen una obligación de pago directa a favor de Soletanche, independientemente del cobro de LPC&D a la AAA. Asimismo, destacamos que la sección 6.23.3 de las condiciones generales del contrato entre la AAA y LPC&D dispone que la AAA no tendrá ninguna obligación de pagar o de velar por el pago de ningún dinero

---

[180] Véase Ap., págs. 2677 y 2680; Informe del Comisionado, determinación de hechos 90.
Item 02 & 03: Monthly invoiced. Payment shall be made monthly on estimate of completed work. Payment shall be received within 7 days after PRASA payment but no more than 60 days after approval of application from the Soletanche's invoice. The period of approval will be of a maximum of 10 days. If LPC & D did not pay on the due date as defined above (total of 77 days of Soletanche's invoice presentation) Soletanche has the right to stop the works.

[...]

Payment Terms: Progress payments will be submitted monthly and shall be payable within the maximum delay established in the Schedule of Prices above.

All the other amount due, **including retention (if any)**, will be paid in full within 90 days of substantial completion date.

An interest rate as established in the contract between LPC&D, Inc. and PRASA will be added to invoice amounts not paid within 77 days from date of invoice. All costs of collection, including attorneys' fees and court costs, will be added to unpaid invoice amount.

Changed Conditions: Notwithstanding all clauses of this contract, if SOLETANCHE INC., during its work, encounters 1) subsurface or latent physical conditions which differ from those indicated in this Agreement, or 2) unknown physical conditions of an unusual nature, differing from those ordinarily encountered, then LPC&D Inc. shall collaborate with SOLETANCHE INC. to recover from PRASA an equitable price and schedule adjustment to compensate for such changed condition.

a ningún subcontratista o sub-subcontratistas, excepto que la ley exija lo contrario[181].

Las determinaciones de hechos que surgen del Informe del Comisionado relacionadas con el subcontrato establecen lo siguiente:

91. El subcontrato estipula que el sitio de trabajo ("site") tiene que ser nivelado y accesible para Soletanche, lo que podría requerir la adición de relleno para una plataforma estable
[...]

93. El subcontrato dispone que, durante el periodo de prueba de las columnas de piedra, Soletanche puede continuar instalando las columnas de piedra al espaciamiento de 2.5 metros en áreas permitidas por el Ingeniero, mientras se determina y decida el espaciamiento final requerido las metas de diseño [...]

94. El subcontrato estipula que la instalación de las columnas de piedras aflojara y mezclara el despojo generado con el relleno instalado en la plataforma de trabajo hasta tres pies de profundidad. Consecuentemente se estipulo que, y LPC&D asumió la obligación en el imperativo de reparar a su costo el daño que sufra la plataforma [...]

95. El subcontrato dispone que la piedra, grava y arena para hacer las columnas de piedra seria suplida por LPC&D [...]

96. El subcontrato estipula para Soletanche ejecutar la obra será de seis a ocho meses, aunque Soletanche planifico completar sus trabajos tempranos, esto, es en seis meses. Así mismo estipula que Soletanche trabajara dos turnos al día y que el tiempo de ejecución excluye movilización, desmovilización e interrupciones por las inclemencias del tiempo o clima [...]El subcontrato entre Soletanche y LPC^D estipula que se añadirán a las facturas y adeudos a Soletanche bajo el subcontrato todos los costos y honorarios de abogado que Soletanche incurra [...]

97. LPC&D cobró el trabajo certificado por Soletanche y aprobado por CSA, y la AAA. El retenido de Soletanche fue parcialmente pagado (principal adeudado a Soletnache en retenido y certificaciones al año 2006 es de $969,720.74 [...]

98. El subcontrato estipulo que Soletanche realizaría su trabajo de manera no interrumpida durante horas regulares de trabajo ("regular working hours", de lunes a sábado, 24 horas al día.

99. LPC&D y Soletanche anticiparon y pactaron que Soletanche realizaría los trabajos en cuatro turnos

---

[181] Véase, App 3519. Subsection 6.23.3 "PRASA shall not have any obligation to pay or to see to the payment of any monies to any Subcontractor, or Sub-Subcontractors except as may otherwise be required by law." Véase Art. 1489 Código Civil 1930.

largos al día, o sea, de 12 horas cada uno, uno nocturno y uno diurno, con dos aparejos por turnos, para un total de cuatro turnos largos de aparejo al día.

100. El subcontrato establece que, si el trabajo de Soletanche se interrumpe por razones no atribuibles a Soletanche o a las inclemencias del tiempo y los equipos no se usan, Soletanche será compensada por daños líquidos a razón de $3,500.00 por turno de aparejo por la detención ("standby") de la ganga o cuadrilla ("crew") y el equipo.

[…]

125. En agosto de 2005 LPC&D decidió dejar en sitio la plataforma de trabajo para que formase parte de la berma en forma permanente debido a que dicha plataforma se comportó excelentemente ante los trabajos ejecutados por Soletanche.

**Por lo antes expuesto, determinamos que es obligación de LPC&D pagar a Soletanche, independientemente de que haya cobrado o no de la AAA**. Además, consideramos que las Fiadoras son solidariamente del pago por trabajos requeridos por las especificaciones, no pagadas (largo de columnas construidos e instalados y no pagados)[182].

Entendemos que el TPI no abusó de su discreción al condenar a LPC&D a pagar a Soletanche por las reclamaciones**. Ante ello, modificamos en cuanto a la responsabilidad de pago, entiéndase, le corresponde a LPC&D y sus fiadoras pagar** por los a) cobro de trabajo realizado y no pagado; b) cambios en los criterios de compactación de la piedra, incrementando el diámetro de las columnas; c) detención en la compactación de las puntas de arena de los pilotes.

Atenderemos en conjunto el **cuarto, quinto, séptimo señalamiento de error presentado en el recurso KLAN202200633** por estar estrechamente relacionados. LPC&D y las Fiadoras aducen que erró el foro primario al acoger el Informe del Comisionado y declarar Con Lugar la reclamación de Soletanche por turnos estériles o detenidos. Sostienen que los turnos de atraso

---

[182] Véase discusión del error séptimo error presentado por LPC&D y las Fiadoras en el recurso de apelación KLAN202200633.

reclamados por Soletanche en la demanda son improcedentes debido a que Soletanche no tuvo turnos estériles o estáticos, sino que computó mal el presunto atraso al no considerar tiempos sin producción que le son atribuible a este y tiempos de producción cuya compensación está incluida en la reclamación por los metros lineales de columnas de piedra a través de la plataforma de trabajo.

Además, el TPI incidió al no reducir las cuantías adjudicadas a Soletanche por sus reclamaciones por turnos detenidos y no tomar en cuenta la cláusula de daños líquidos pactada en el subcontrato. Sostienen que el foro primario otorgó cantidades adicionales en contra del daño líquido pactado. Asimismo, reiteran que el TPI incidió al dictar la Sentencia acogiendo el Informe del Comisionado y condenar a las Fiadoras a pagar a Soletanche por las reclamaciones de Soletanche por daños por los atrasos en el Proyecto, las cuales no son por mano de obra o materiales puestos por Soletanche en el Proyecto.

Surge del expediente que en varias ocasiones Soletanche estuvo sustancialmente paralizado[183]. Sobre ese particular damos deferencia al Informe del Comisionado. Además, al revisar el subcontrato entre Soletanche y LPC&D establece que las partes pactaron lo siguiente:

> **Progression of the work**: Soletanche Inc.'s proposal is based upon carrying out the work in an unobstructed manner during regular working hours, Monday through Saturday, 24 hours per day, in a single uninterrupted visit to the site. Soletanche Inc.'s reserve the right to work overtime or weekend at Soletanche Inc.'s discretion without incurring charges for inspections, site overhead or the other consequential charges[184].

Sin embargo, en las Condiciones Generales AAA y LPC&D pactaron lo siguiente:

> **Art. 6 Prosecution of Work**
> Section 6.01- Regular Work Hours

---

[183] Véase Ap., págs. 1257-1281; Determinaciones de hecho 190, 150, 121, 129.
[184] Véase Ap., pág. 2678.

> All Work at the site shall be performed during regular working hours. Contractor shall not perform Work on Saturday, Sunday, or any legal holiday except when 1) it is clearly indicated in the approved construction plan and schedule, 2) it is required for safety reasons, for the protection of life, property or for the protection of the Work. Contractor shall notify PRASA's Representative immediately when a situation described in 2) herein occurs[185].

Así pues, LPC&D conocía de antemano al otorgamiento del contrato con Soletanche, las restricciones establecidas por el dueño de la obra, la AAA, y era previsible que ocurriesen los turnos estériles o merma de producción. Por tanto, LPC&D no puede pretender desligarse de su comportamiento ni de su obligación contractual[186], ante ello, determinamos que LPC&D no actuó con las manos limpias al argumentar que Soletanche ocasionó el tiempo de atraso. **El cuarto no error fue cometido en cuanto a LPC&D**. Referente a las Fiadoras se discutirá más adelante. [187].

Ahora bien, en el quinto señalamiento de error, LPC&D y las Fiadoras exponen que el subcontrato entre Soletanche y LPC&D, se estableció una compensación por daños líquidos a favor de Soletanche por la suma de $3,500.00 por día de retraso por aparejo de perforación[188]. Por otro lado, en el séptimo señalamiento de error, LPC&D y las Fiadoras indican que incidió el TPI al dictar la Sentencia acogiendo el Informe del Comisionado y condenar a las Fiadoras a pagar a Soletanche por las reclamaciones de Soletanche por daños por los atrasos en el Proyecto, las cuales no son por mano de obra o materiales puestos por Soletanche en el Proyecto. Aprovechamos para destacar que entre la AAA y Soletanche no

---

[185] Véase Ap., pág. 2364.

[186] El contrato de subcontratación le impone una obligación a LPC&D de pagar daño líquido[186] . Progression of the Work: [...] In the event that SOLETANCHE INC.'s work is interrupted for any reason beyond our control, weather excepted, SOLETANCHE INC. shall be compensated at the rate off $3,500.00 per shift per rig for standby of the crew and the equipment. [...]".

[187] Véase discusión del error séptimo error presentado por LPC&D.

[188] Véase Ap., pág. 2678. "Progression of the Work: [...] In the event that SOLETANCHE INC.'s work is interrupted for any reason beyond our control, weather excepted, SOLETANCHE INC. shall be compensated at the rate off $3,500.00 per shift per rig for standby of the crew and the equipment. [...]". Véase además, Ap. pág. 1252; Informe del Comisionado, determinación de hechos 102.

existía una relación contractual, por lo que tal cláusula sobre daños líquidos no le crea obligación alguna a la AAA.

Ciertamente es un principio cardinal en nuestro ordenamiento jurídico que las obligaciones nacen de la ley, de los contratos, cuasicontratos y de los actos y omisiones ilícitos en que intervenga cualquier género de culpa o negligencia, Art. 1042[189]. A su vez, las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse a tenor de lo pactado Art. 1044[190]. Cónsono con lo anterior el subcontrato tiene una cláusula penal. El Art. 1106 del Código Civil dispone, en lo pertinente, que "[e]n las obligaciones con cláusula penal, **la pena sustituirá a la indemnización de daños y al abono de intereses en caso de falta de cumplimiento**, si otra cosa no se hubiere pactado"[191]. Los efectos de la cláusula penal sólo se producen cuando se incumple con la obligación principal. El incumplimiento total, parcial, defectuoso o tardío por parte del obligado activa la *conditio iuris* que provoca la eficacia de la cláusula penal. La cláusula penal cumple importantes funciones, tiene un fin coercitivo, punitivo y liquidador de los daños y perjuicios que represente[192].

En los casos en que existiere una cláusula penal, la pena substituirá a la indemnización de daños y perjuicios y al abono de intereses, salvo pacto en contrario[193]. En otras palabras, la cláusula penal constituye los daños y perjuicios pactados. **Colegimos que, al existir la cláusula penal de daños líquidos, procede eliminar la partida concedida de $1,251,218.30. Se modifica la sentencia para establecer que el único responsable de pago bajo la cláusula**

---

[189] 31 LPRA ant. sec. 2992.
[190] 31 LPRA ant. sec. 2994, *Mercado Quilichini v. U.C.P.R.*, 143 DPR 610, 627 (1997).
[191] 31 LPRA ant. sec. 3131.
[192] *R.C. Leasing Corp. v. Williams Int. Ltd.*, 103 DPR 163, 169 -170 (1974).
[193] *Levitt & Sons of P.R., Inc. v. D.A.C.o.*, 105 DPR 184, 192 (1976).

**penal es LPC&D, determinamos excluir de pago de daños líquidos y/o clausula penal a la AAA y las fiadoras. Se le ordena al TPI realizar la aplicación y computo de la cláusula penal**.

Por otro lado, en cuanto al séptimo señalamiento de error, del expediente apelativo se desprende que LPC&D gestionó y obtuvo la emisión de fianza de pago y fianza de ejecución para la totalidad de la obra que asciende a $103,632,270.00. La fianza de pago fue emitida de forma solidaria por las Fiadoras bajo el número 08755115 el 16 de noviembre de 2004. Conforme a la estipulación 52 del *Informe de Conferencia con Antelación a Juicio,* las partes estipularon que:

> Conforme los requisitos del contrato LPC&D gestionó y obtuvo fianza de pago y ejecución de obra solidarias por la totalidad contratada con AAA. Las compañías de fianza de LPC&D son Zurich American Insurance Company, Fidelity Deposit Company of Maryland, XL Specialty Insurance Company y XL Reinsurance America Inc. Esas fianzas tienen el número 08755115 para el "*Payment Bond*" y son por la suma principal de $103,632,270.00 fechada[s] 16 de noviembre de 2004[194].

Mediante una fianza de pago, la fiadora le garantiza al dueño de la obra que toda la labor y los materiales utilizados en el proyecto serán pagados por la fiadora si el contratista general incumple[195]. En el caso de autos, el Informe del Comisionado impone responsabilidad de pago a las fiadoras. No obstante, y si bien es cierto que se le da deferencia a la apreciación de la prueba y las recomendaciones del Comisionado, en esta ocasión, debemos intervenir por entender que se cometió error.

No cabe duda de que las fiadoras se obligaron contractualmente a un ***Performance Bond.*** A diferencia del ***Payment Bond*** el ***Performance Bond*** "garantiza al dueño de la obra que el contratista va a ejecutar el proyecto de acuerdo con el

---

[194] Véase Ap., pág. 919.
[195] *Andamios de Puerto Rico, Inc. v JPH Contractors Corporation*, 179 DPR 503 (2010).

contrato de construcción, o pagará los daños incurridos hasta el límite de dinero establecido en la fianza" [196] . **Por tanto, determinamos que este error se cometió** debido a que la única reclamación de Soletanche relacionada con la labor y los materiales utilizados en el proyecto son las alegaciones a) Largo de columnas construidos e instalados y no pagados, b) cambios en los criterios de compactación de la piedra, incrementando el diámetro de las columnas; c) detención en la compactación de las puntas de arena de los pilotes. La otra reclamación no está cubierta por el contrato de fianza.

Es por ello, por lo que **modificamos la Sentencia apelada** para que especificar que sobre la partida de daños líquidos o cláusula penal por retrasos, detención, etc. las Fiadoras no responderán solidariamente, porque no se le puede imponer responsabilidad u obligación a las fiadoras sobre las otras alegaciones por no estar cubiertas en el contrato de fianza.

-**D**-

Atenderemos en conjunto todos los señalamientos de error relacionados con temeridad e imposición del pago de honorarios. LPC&D en su **sexto señalamiento de error**, del recurso **KLAN20220633**. Esboza que el TPI erró al dictar la Sentencia acogiendo el Informe del Comisionado y conceder a Soletanche sobre $1.7 millones en honorarios de abogado sin tomar en cuenta el carácter restrictivo del pacto entre LPC&D y Soletanche en el subcontrato sobre el pago de honorarios de abogado y sin que Soletanche sometiera en evidencia las facturas correspondientes a más de $1.2 millones de los más de $1.7 millones reclamados por Soletanche.

---

[196] Véase, *Aspectos a considerar en las distintas etapas de los proyectos de construcción de obras públicas y mejoras permanentes*, Folleto Informativo 2020, Oficina del Contralor del Estado Libre Asociado de Puerto Rico, pág. 63.

A su vez en el **décimo señalamiento error**, de la **KLAN20220633** LPC&D aduce que incidió el TPI al dictar la Sentencia acogiendo el Informe y determinar que la AAA y CSA fueron temerarios, pero no imponerles a estas pagar a LPC&D una suma razonable por concepto de honorarios de abogados por temeridad y, a su vez, al determinar que LPC&D y las Fiadoras fueron temerarias por LPC&D haber formulado su reconvención contra Soletanche.

El 12 de agosto de 2022, CSA compareció acudió ante este Tribunal mediante el recurso de *Apelación* con la designación alfanumérica **KLAN202200634.** En el **primer señalamiento de error,** CSA adujo que incidió el TPI al acoger, sin base en la prueba, recomendaciones de determinaciones de hechos sugeridas por el Comisionado Especial que resultan incongruentes y aluden a actuaciones intencionales de CSA en perjuicio de terceros al ejecutar funciones como Gerente de Construcción de Obra. Además, en su **segundo señalamiento de error** de **la KLAN20220634** que el foro primario cometió error al acoger del Informe del Comisionado Especial y concluir que CSA incurrió en temeridad.

Asimismo, en el **séptimo señalamiento de error**, de la **KLAN20220643**, la AAA expone que incidió el TPI al decretar la temeridad de la AAA en la Sentencia apelada, adoptando la recomendación infundada del Comisionado Especial en su Informe.

Antes de expresarnos sobre la corrección o no del Informe del Comisionado y la Sentencia impugnada en cuanto la responsabilidad sobre temeridad es indispensable examinar las siguientes determinaciones de hechos:

> 177. El Ingeniero Douglas Keil, testigo de LPC&D informo que concurre con la reclamación presentada por Soletanche, que únicamente prefería que la parte #4 de la reclamación sobre turnos pocos productivos fuese más sustanciada. El Ing. Keil concurre con la reclamación personal y profesionalmente. Keil 24 de marzo 2015-94-99/128; Keil 14

abril2015pags. 44- 50/49/61. Añade en su nota al calce #21 Admisión de parte, Regla de Evidencia 803 (a) y (d). Dicha admisión para el Comisionado es importante para porciones ulteriores de este reporte, demuestra entereza en el verbo y conducta de LPC&D en el trámite durante de la obra y los reclamos.[197]

211. [...] CSA, luego de años de haber implantado modificación a los términos y especificaciones del contrato, y de haberse negado a pagar trabajo correctamente realizado, al final de las vistas, por voz del Ingeniero Fletcher finalmente admitio que siempre se supo que la plataforma de trabajo sería necesaria. Tal conducta es temeraria según el termino se define en la jurisprudencia. El propósito de la imposición de honorarios de abogado en caso de temeridad es establecer una penalidad a un litigante perdidoso que, por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito". Fernández v San Juan Cement, 118 DPR 713, 718 (1987), y Jarra Corp v Axxis Corp, 155 DPR 764 (2001).

[...]

Esa ha sido la conducta de la AAA y de CSA en el proceso de este caso; temeraria.

[...]

La AAA, CSA y LPC&D han actuado de forma temeraria, ello es un hecho. En cuanto a LPC&D su temeridad ha consistido en tramitar la reconvención contra Soletanche, desprovista de fundamento o evidencia alguna, cuando desde octubre de 2008 recupero lo que reclama contra Soletanche, y más por hechos que contradicen su reclamo a Soletanche. La consecuencia de la temeridad la establece la Regla 44.1 (d) de Procedimiento Civil. [...][198]

**Temeridad:**

[...]

El Comisionado toma en consideración el trámite del caso, su complejidad, volumen, costo y que conforme el contrato, a Soletanche, se le reembolsan los honorarios anteriormente indicados [e] incurridos hasta el final de las vistas, aunque los mismos patentemente continúan y continuarán. Se declara la temeridad de la AAA y se recomienda la imposición de honorarios a ser pagados por la AAA y CSA a Soletanche conjuntamente por la suma de quinientos mil dólares. Se recomienda imposición de honorarios a ser pagados por la AAA a Soletanche conjuntamente por la suma de quinientos mil dólares. Las anteriores, son imposiciones independientes no recobrables contra otras partes[199].

---

[197] Véase Ap., pág. 1276.
[198] Véase Ap., págs. 1290-1292.
[199] Véase Ap., pág. 1316.

Según el Informe del Comisionado, los honorarios de abogado incurridos por Soletanche hasta julio de 2015 se establecieron en $1,220,216.29; más $558,991.62 facturado posterior a julio 2015, para un total de $1,779,207.00. Se estableció que procede el pago de honorarios de abogado reclamados por Soletanche por LPC&D y las Fiadoras, quienes recobran las cuantías de la AAA por ser quien presuntamente provocó el largo litigio.

La Regla 44.1(d) de Procedimiento Civil, *supra*, rige la imposición de los honorarios de abogado. La regla establece lo siguiente:

> En caso de que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable, el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta.
> Un tribunal deberá imponer una suma por los honorarios de abogado a una parte que, por sí o mediante su representación legal, haya actuado con temeridad o frivolidad. La conducta que amerita la imposición de los honorarios de abogado es cualquiera que haga necesario un pleito que se pudo evitar, o gestiones evitables[200].

La determinación de si una parte ha actuado o no con temeridad descansa en la discreción del tribunal, por lo que el Tribunal Supremo sólo intervendrá cuando surja de tal actuación un claro abuso de discreción[201]. La jurisprudencia ha señalado los siguientes actos como temerarios: "cuando el demandado contesta la demanda y niega su responsabilidad total, aunque la acepte posteriormente; cuando se defiende injustificadamente de la acción que se presenta en su contra; cuando no admite francamente su responsabilidad limitada o parcial, a pesar de creer que la única razón que tiene para oponerse a la demanda es que la cuantía es exagerada; cuando se arriesga a litigar un caso del que *prima facie*

---

[200] *Ramírez v. Club Cala de Palmas*, 123 DPR 339 (1989).
[201] Andamios de Puerto Rico v JPH Contractors 179 DPR 503, (2010).

se desprende su negligencia; o cuando niega un hecho que le consta ser cierto[202]."

Según la doctrina de manos limpias, la persona que busca un remedio no puede acudir al foro adecuado con mala fe o intenciones deshonestas. En Puerto Rico, el Tribunal Supremo ha resuelto en innumerables ocasiones que quien va en busca de equidad debe tener las manos limpias[203]. Entendemos que el recurrente no actuó con las manos limpias al continuar con la reconvención cuando esta fue transada desde el 2008.

Al analizar el expediente en su totalidad, **concluimos que LPC&D fue temeraria en la continuación de la tramitación de las cuestiones alegadas en la *Reconvención* contra Soletanche tal y como determinaron el Comisionado y el foro primario.** Tras examinar minuciosamente las alegaciones presentadas en la *Reconvención,* colegimos que fueron transadas por medio del Acuerdo entre LPC&D y AAA. Así pues, reiterar la *Reconvención* inexistente es un acto temerario y frívolo por lo cual la imposición de honorarios de abogados por temeridad contra LPC&D es un ejercicio válido de sana discreción del TPI.

No obstante, al evaluar las conclusiones en el Informe del Comisionado sobre la imposición de temeridad a la AAA y CSA es errada. No obra prueba que sustente esas determinaciones de hechos ni conclusión de derecho. Tras examinar, las transcripciones de las vitas en unión a todos los contratos[204] relacionados con el rol de CSA y la Ley Núm. 173 del 12 de agosto de 1988[205], reiteramos la doctrina jurídica referente a la interpretación de los contratos y

---

[202] *Fernández v. San Juan Cement Co., Inc., supra,* págs. 718-719.
[203] *Don Quixote Hotel v. Tribunal Superior*, 100 DPR 19 (1971); *Lassalle v. Valencia*, 39 DPR 612 (1929); *Núñez v. López,* 62 DPR 567 (1943); *Goffinet v. Polanco,* 32 DPR 910 (1924).
[204] Véase Ap., págs. 2315, 2113 y 3678.
[205] 20 LPRA secc. 711 *et. seq.*

de conformidad con el Art. 1233 del Código Civil[206], "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas". En todo caso, las cláusulas de un contrato deben interpretarse de manera integrada, buscando su verdadero sentido en la relación de unas cláusulas con las otras del mismo instrumento. La interpretación final debe ser cónsona con el principio de la buena fe y no llevar a resultados incorrectos, absurdos e injustos para alguna de las partes[207].

Así pues, las determinaciones del Comisionado sobre la alegada conducta incorrecta de CSA se basan en una lectura individualizada y polarizada de las cláusulas contractuales ni hubo prueba de dolo e interferencia torticera. **Ante ello, el primer y segundo señalamiento de error del KLAN202200634 y el séptimo señalamiento de error del KLAN20220643**, **fueron cometidos**. Resulta necesaria la intervención de este foro con el ejercicio de dicha discreción porque colegimos que el Informe del Comisionado incurrió en un craso abuso de discreción y actuó con prejuicio o parcialidad.

Por tanto, **procede modificar la sentencia en cuanto a que la AAA ni CSA fueron temerarios. En la situación de autos la única que demostró temeridad fue LPC&D, las Fiadoras no responden por esta partida. El lenguaje del contrato de fianza es claro que las Fiadoras solo son responsable de las cuentas de los materiales y mano de obra, nada más**.

Con relación al **tercer error del KLAN20220634,** CSA alega que el TPI incidió al acoger del Informe del Comisionado Especial su

---

[206] 31 LPRA secc. 3471.
[207] *Guadalupe Solis v. González Durieux,* 172 DPR 676, 685 (2007).

recomendación de imponer a CSA el pago de forma conjunta de una excesiva suma de honorarios de abogado por concepto de temeridad. Además, en su **quinto señalamiento de error**, la AAA alega que incidió el TPI al imponerle el pago de los honorarios de abogados del subcontratista Soletanche, pactados por LPCD y Soletanche.

El Informe del Comisionado y la Sentencia impugnada imponen a la AAA la responsabilidad de pago por concepto de honorarios a favor de Soletanche. Sin embargo, la única cláusula relativa a pago de honorarios está contenida en el subcontrato de Soletanche y LPC&D. Por lo tanto, no cabe duda de que, Soletanche no tenía ningún vínculo contractual con la AAA[208], así pues, como ha determinado el Tribunal Supremo y consistentemente se ha rechazado la aplicación de cualquier remedio en equidad, como el enriquecimiento injusto, para indemnizar los daños sufridos por una parte privada cuando no se han cumplido los requisitos de **contratación** gubernamental[209]. Asimismo, bajo la doctrina de contratación gubernamental el Tribunal Supremo ha determinado que:

> La rigurosidad de estos preceptos responde al gran interés del Estado en promover una sana y recta administración pública, mediante la prevención del despilfarro, la corrupción y el amiguismo en la contratación gubernamental[210].

> Además, el Tribunal Supremo ha señalado que, debido a la mayor rigurosidad que gobierna la contratación con los municipios y las agencias de gobierno, "se presume que las partes que así contratan ya conocen la necesidad de conducirse de acuerdo con las especificaciones de la ley"[211].

Dicho lo anterior, bajo el ordenamiento jurídico de contratación gubernamental, es errada la imposición de pago de honorarios por la AAA. En cuanto a la imposición de honorarios

---

[208] Véase Ap., pág. 1238; Informe del Comisionado, determinación de hecho 41.
[209] *ALCO Corp. v. Municipio de Toa Alta,* 183 DPR 530 (2011).
[210] *Las Marías v. Municipio de San Juan,* 159 DPR 868, 875 (2003); *CMI Hospital v. Departamento de Salud,* 171 DPR 313, 230 (2007).
[211] *Íd.,* pág. 321; *Hatton v. Municipio de Ponce,* 134 DPR 1001 (1994).

contra CSA, tampoco procede porque la determinación de temeridad del Informe del Comisionado o de la Sentencia impugnada fue errada.

Resolvemos que, la única parte responsable de los mismo es LPC&D, por tener una cláusula relacionada con honorarios. Sin embargo, el foro primario deberá determinar la cuantía de los honorarios basado en la cláusula *Progression of the Work* establecida en el subcontrato entre Soletanche y LPC&D. **Se modifica la sentencia para excluir del pago de honorarios a AAA y CSA y se ordena al TPI determinar los honorarios conforme al subcontrato y el impuesto por temeridad contra LPC&D**.

En el **octavo señalamiento de error**, de la **KLAN20220633** LPC&D arguyó que erró el TPI al dictar la Sentencia acogiendo el Informe del Comisionado y denegar las reclamaciones de Soletanche y LPC&D contra CSA bajo la teoría de que las acciones de la AAA constituyeron una causa interventora que liberó a CSA de responsabilidad.

Si bien es cierto que se le da deferencia a la apreciación de la prueba y las recomendaciones del Comisionado, en esta ocasión, debemos intervenir por entender que se cometió error. Los hechos determinados y probados establecen que CSA fue contratado por la AAA para fungir como gerente de Proyecto. Toda comunicación en la obra se estableció por conducto de CSA.

Nuestro ordenamiento jurídico reconoce la existencia de una causa de acción por interferencia torticera con una relación contractual[212]. Los elementos de dicha causa de acción son los siguientes: (1) la existencia de una relación contractual con la cual interfiera un tercero (si lo que se afecta es una expectativa o una relación económica provechosa sin existir contrato, no procede la

---

[212] *Gen. Office Prods. v. A.M. Capen's Sons*, 115 DPR 553 (1984).

acción); (2) debe mediar culpa, es decir, el tercero debe actuar intencionalmente, con conocimiento de la existencia del contrato y que, al interferir con éste, se causaría perjuicio; (3) la existencia de un daño sufrido por el actor; y (4) un nexo causal entre el acto culposo del tercero y el incumplimiento del contrato. Basta que el tercero hubiera provocado o contribuido a la inejecución o incumplimiento del contrato[213].

Examinado los elementos previamente mencionados con el Informe del Comisionado, así como las transcripciones de las vistas, no surge del expediente que demuestre una conducta o patrón constitutiva a dolo o interferencia torticera. Por lo que la determinación del Informe del Comisionado es errada, así como la aplicación de la doctrina de causa interventora. **El error fue cometido por los fundamentos que explicamos anteriormente**.

Expuso LPC&D en su **undécimo señalamiento de error del KLAN20220633** que el TPI actuó incorrectamente al dictar la *Sentencia* mediante la cual acogió el Informe sin corregir los errores aritméticos contenidos en el mismo respecto a las cuantías adjudicadas a favor de LPC&D.

Según surge de la *Resolución* dictada el 14 de julio de 2022 por el TPI, "[s]e admite un *error de forma* por lo que procede declarar Ha Lugar la solicitud de corrección del punto decimal en la página 89 del Informe del Comisionado, según dispone la Regla 49.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 49.1. La suma debió ser $132,816.00." Corregido el numero por la Resolución del 14 de julio de 2022, **determinamos que este error no fue cometido**.

Por último, en el duodécimo señalamiento de error del KLAN20220633, LPC&D argumentó que el TPI incidió al no hacer

---

[213] *Jusino et als. v. Walgreens*, 155 DPR 560, 575-576 (2001); *Dolphin Int'l of P.R. v. Ryder Truck Lines*, 127 DPR 869, 879 (1991).

justicia y aplicar la equidad, incluyendo la doctrina de *rebus sic stantibus,* y resolver que, ante la aprobación de la Ley Núm. 3 del 2017 o cualquier ley similar aprobada posteriormente, LPC&D y las Fiadoras no tienen que pagar suma alguna a Soletanche hasta tanto la AAA no venga obligada a pagar las mismas a LPC&D o las Fiadoras. **En cuanto al duodécimo error, cabe destacar que no fue argumentado ante el foro *a quo*, y con las modificaciones que hemos determinado es innecesaria su atención**[214].

-E-

En el **cuarto señalamiento de error del KLAN20220643,** la AAA alega que erró el TPI en la imposición de intereses presentencia a una tasa equivocada y desde una fecha errónea. Adelantamos que este error se cometió por el foro primario. Los únicos intereses que forman parte integrante de la sentencia y pueden ser recobrados aun cuando no se mencionen en la misma, son los que **se devengan a partir de la fecha en que ésta se dicta**, porque deben ser considerados automáticamente como parte de la sentencia, por mandato de ley[215]. Así pues, la AAA tiene que pagar la reclamación e) de la Demanda de Soletanche sobre trabajo certificado y adeudado por la cuantía de $962,768.95 con los intereses a base de la Regla 44.3[216]. Referente a los pagos de intereses a pagar por LPC&D, sus fiadoras (reclamaciones a, b, c y d, se ordena al TPI determinar los intereses correspondientes conforme al contrato otorgado entre

---

[214] En estos casos, nuestro Alto Foro ha resuelto que: …no se conocerá ni resolverá ningún planteamiento que no hubiese sido presentado o dirimido por el tribunal o agencia administrativa de cuya sentencia o resolución se haya recurrido o apelado. Por otra parte, la jurisprudencia ha delineado otra norma limitativa de nuestra capacidad de revisar decisiones de foros inferiores. La misma recoge el principio de que el cometido de los tribunales apelativos se circunscribe a considerar controversias que hayan sido planteadas o resueltas por el foro *a quo*. En otras palabras, que no se conocerá ni resolverá ningún planteamiento que no hubiese sido presentado o dirimido por el tribunal o agencia administrativa de cuya sentencia o resolución se haya recurrido o apelado. Véase, *Abengoa, S.A. v. American Intl. Ins.,* 176 DPR 512 (2009); *Trabal Morales v. Ruiz Rodríguez,* 125 DPR 340, 351 (1990); *Piovanetti v. Vivaldi,* 80 DPR 108, 121-122 (1957); *Autoridad Sobre Hogares v. Sagastivelza,* 71 DPR 436, 439 (1950).
[215] Véase, 32 LPRA Ap. V, R. 42.2.
[216] *Íd.*

Soletanche y LPC&D. En cuanto a los intereses por temeridad (b) el TPI lo determinara a base de la Regla 44.3 (b) de Procedimiento Civil[217].

**IV.**

**-A-**

Corresponde ahora atender los casos **KLAN202200726, KLCE202201012 y KLCE202201013**. En específico, LPC&D y las Fiadoras, a través del recurso KLAN202200726, impugnan el *Memorando de Costas* presentado por Soletanche y cuestionan la validez de la *Resolución* emitida y notificada el 14 de julio de 2022 por el TPI. Por otro lado, la AAA, mediante los recursos de *certiorari* KLCE202201012 y KLCE202201013, impugna tanto el *Memorando de Costas* propuesto por LPC&D como el presentado por Soletanche. Asimismo, impugnó la validez de la *Resolución* recurrida fundamentándose en una violación del debido proceso de ley. Habiendo examinado minuciosamente el expediente que está ante nuestra consideración nos disponemos a resolver.

En primer lugar, procederemos a examinar los señalamientos de error que cuestionan la validez de la *Resolución* emitida y notificada el 14 de julio de 2022 por el TPI, la cual acogió los memorandos de costas presentados en el caso de marras. Por un lado, LPC&D alega que el TPI emitió su dictamen de imponerle el pago de costas a favor de Soletanche en contravención con lo estipulado por el Informe, el cual según LPC&D, lo eximió del pago de costas en este pleito. De otra parte, la AAA plantea que el TPI erró al emitir su determinación, alegando que el foro primario se fundamentó en una resolución previa la cual fue declarada nula por el Tribunal de Apelaciones, violándose así el debido proceso de ley.

---

[217] 32 LPRA Ap. V, R. 42.2.

Sostenemos que ninguno de estos dos señalamientos de error se cometió. Veamos.

LPC&D aduce en su escrito que el Informe, el cual fue acogido en su totalidad en la *Sentencia* del 6 de mayo de 2019, relevaba a este peticionario del pago de costas. En específico, esta parte reseña lo siguiente:

> Soletanche no será responsable por costas a parte alguna, ni por honorarios de abogado o ajuste o reducción al valor o contenido de la sentencia que en su favor se dicte. Tampoco lo son LPC&D ni CSA[218].

Empero, un panel hermano atendió una controversia relacionada con el alcance de las determinaciones que podía hacer el Comisionado en este mismo pleito. En aquella ocasión, este foro apelativo resolvió que las labores del Comisionado cesaron una vez se emitió la *Sentencia* de 6 de mayo de 2019 y concluyó que "el TPI no puede delegar al Comisionado la adjudicación de mociones post sentencia"[219]. Sabido es que la concesión de costas es un asunto post sentencia, ya que su solicitud se hace a partir de la notificación del archivo en autos de la sentencia. Por ende, la aludida instrucción del Comisionado no es vinculante en cuanto a la consideración de otorgar costas en esta controversia.

De otra parte, tampoco es meritoria la contención de la AAA en cuanto a que la *Resolución* recurrida es improcedente por tratarse de un dictamen que, al fundamentarse en la *Resolución* del 10 de diciembre de 2019, la cual según la AAA se determinó que era nula, se le violentó el debido proceso de ley a este peticionario. Lo anterior responde a lo que un panel hermano resolvió en una *Sentencia* del 28 de febrero de 2020. En aquel momento, este Tribunal de Apelaciones concluyó que **la notificación de la *Resolución* del 10 de diciembre de 2019 fue nula** esbozando el siguiente fundamento:

---

[218] Véase Ap., pág. 1318.
[219] Véase el caso KLCE201901101, resuelto el 30 de septiembre de 2019, pág.13.

> En fin, desde la fecha de la presentación de los tres recursos de apelaciones (KLAN201900932, KLAN201900933 y KLAN201900934) ante este foro revisor, el 21 de agosto de 2019, el Tribunal de Primera Instancia perdió jurisdicción para poder continuar con los procedimientos hasta tanto recibiera el mandato correspondiente. Como consecuencia, la notificación de la *Resolución* del 11 de diciembre de 2019 **resultó nula**. El Tribunal de Primera Instancia debió aguardar al recibo del mandato emitido el 13 de diciembre de 2019 por este Tribunal de Apelaciones para actuar. Una vez el foro primario recibiera el mandato, **procedía, entonces, notificar su determinación.** Solo así, comenzarían a decursar los términos para presentar el recurso ante este foro revisor[220]. (Énfasis nuestro).

Nótese que, en ningún momento este foro declaró nula la referida *Resolución* en sus méritos, sino más bien, la aludida determinación estuvo enfocada estrictamente en la notificación de ese dictamen. La consecuencia de que se haya emitido una notificación nula o defectuosa afecta el aspecto procesal del caso en cuanto a al establecimiento de los términos para recurrir a un foro apelativo, dado a la incertidumbre que se genera a la hora de tomar en consideración los términos para acudir a un tribunal de mayor jerarquía[221]. En vista del análisis que antecede, resolvemos que los errores formulados tanto por LPC&D como la AAA en cuanto la validez de la *Resolución* recurrida, no se cometieron por parte del TPI.

**-B-**

El *Memorando de Costas* propuesto por Soletanche es objeto de disputa tanto por parte de LPC&D y las fiadoras como por la AAA. El aludido memorando fue declarado Ha Lugar por el foro *a quo*, concediendo así todas las partidas solicitadas por la parte recurrida en el caso de epígrafe. No obstante, a tenor con nuestra función revisora, procederemos a evaluar si estas costas fueron concedidas conforme a derecho. A continuación, examinaremos las partidas solicitadas las cuales se desglosan de la siguiente manera:

---

[220] Véase el caso KLAN202000036 Consolidado con KLAN202000037, KLAN202000038, KLCE202000137 y KLCE202000139 en las págs. 15-16.
[221] *Plan Salud Union v. Seaboard Sur. Co.,* 182 DPR 714, 723 (2011).

a) Fotocopias ($31,151.62)

b) Emplazamientos Citaciones-Testigos Juicio y Deposición ($430.60)

c) Sellos de Rentas Internas ($181.00)

d) Costo de Investigación Electrónica ($5,422.15)

e) Pago de honorarios al Comisionado Especial ($233,381.19)

f) Pago Honorarios al peritaje Incluyendo al contable ($76,426.00)

g) Mensajería ($1,350.50)

h) Faxes ($321.25)

i) Deposiciones, Transcripciones, comparecencias y sesiones ($5,532.91)

j) Taquígrafos ($20,526.72)

k) AFDA ($10,373.22)

l) Fondos consignados en Corte por Orden ($504.00)

m) Gastos Viaje a Deposición fuera de Puerto Rico ($6,232.68)

n) Gastos de Viajes de Testigos fuera de Puerto Rico ($28,978.58)

o) Peritaje estructura del subsuelo. ($10,000.00)[222]

Guiándonos por los principios establecido por nuestro ordenamiento jurídico en cuanto a la evaluación de la concesión de costas las cuales deben ser **necesarias, incurridas y razonables**[223], evaluaremos las partidas precitadas. En torno a las cuantías relacionadas con la *Mensajería, Faxes* y gastos en *Fotocopias* nuestro más Alto Foro ha sido claro en que los "gastos de oficina generales, necesarios para el ejercicio de la profesión de abogado, **no [son] recobrables como costas**"[224] (Énfasis suplido). De acuerdo con la jurisprudencia, estos gastos incluyen servicio de mensajero, servicio de fotocopias e incluso las partidas dirigidas a sufragar los gastos de papel de copia para contestación a interrogatorio[225]. Claro está, nuestro Máximo Foro también resolvió que son recobrables como costa los gastos incurridos por las copias de un escrito de

---

[222] Véase Ap., pág. 1819.
[223] *Garriga, Jr. v. Tribunal Superior, supra.*
[224] *Andino Nieves v. A.A.A.,* 123 DPR 712, 718 (1989).
[225] *Íd.*

apelación con sus respectivos legajos[226]. Sin embargo, es menester nuestro destacar que esto es aplicable únicamente a gastos relacionado con el litigio apelativo. En esta controversia, no consta en el *Memorando de Costas* alguna descripción o explicación de cómo se gastó esa cuantía proveniente de las fotocopias. Por tratarse de gastos ordinarios de oficina, y no ofrecer un desglose detallado que justificaran su concesión, **no se aceptan los gastos por concepto de <u>fotocopias, mensajeros y faxes</u> propuesto por Soletanche**.

Referente a las partidas de *Gastos Viaje a Deposición fuera de Puerto Rico* y *Deposiciones, Transcripciones, comparecencias y sesiones* **resolvemos que estas son improcedentes**. El Tribunal Supremo de Puerto Rico ha expresado que "[e]l gasto incurrido en obtener deposiciones es recobrable si son necesarias, aunque no se usen en las vistas del caso"[227]. En la controversia que está ante nuestra consideración, no se nos proveyó copia de las transcripciones de las mencionadas deposiciones. Tampoco se nos justificó como etas deposiciones ayudaron a que Soletanche prevaleciera en el pleito. Por no estar en posición para poder justipreciar que tan necesarias fueron estas deposiciones para probar el caso de Soletanche, **resolvemos no conceder las partidas solicitadas en cuanto a las <u>deposiciones</u> y <u>los gastos incurridos en viaje para la toma de estas</u>**. De igual manera, la partida identificada como *Costo de Investigación Electrónica* carece de explicación o fundamento alguno que justifique su recobro, por lo cual **resolvemos no concederla**.

Por otro lado, Soletanche reclama que se le pague las costas por concepto de *Gastos de Viajes de Testigos fuera de Puerto Rico.*

---

[226] *Sanchez v. Sylvania Lighting,* 167 DPR 247, 254 (2006).
[227] *Pereira v. I.B.E.C.,* 95 DPR 28, 78 (1967).

Según se desprende de uno de los anejos[228] que acompañó el *Memorando de Costas* de Soletanche las siguientes personas viajaron para testificar a la vista y se incurrieron en los gastos aquí ilustrado:

    a. Thomas Beggs ($22,978.57)
    b. Eloy Ramos ($2,5000.00)
    c. Juan Pallares ($2,000.00)
    d. Mark Plaskett ($2,000.00)

Nuestro ordenamiento jurídico justifica el pago por conceptos de costas en los casos de viajes a testigo cuando el testimonio de estos no sea claramente innecesarios o superfluo[229]. Luego de una exhaustiva evaluación del expediente determinamos lo siguiente: En cuanto a los gastos de viaje relacionados a Thomas Beggs, **resolvemos no incluirlo a las partidas de costas solicitadas**, <u>**dado que esta persona ni tan siquiera fue testigo en el caso**</u>[230]. Por otro lado, determinamos que tampoco proceden las costas en cuanto a los testimonios de Eloy Ramos, Mark Plaskett y Juan Pallares. Esto responde a que estos fueron testigos ordinarios de Soletanche, los cuales, si bien ayudaron a sostener su caso, no son elegibles para el repago de costas por su labor[231]. Por lo tanto, en cuanto a estas partidas, **resolvemos que no proceden**.

Habiendo establecido lo anterior, corresponde atender los méritos de la solicitud de la concesión de costas por los peritos. En su memorando, Soletanche, solicita que se repague los gastos incurridos en dos peritos: el Dr. Fabian Kirsch y el CPA Jorge Rodríguez Suarez. La normativa vigente en cuanto a la concesión de este tipo de costas dispone que, a la hora de pasar juicio sobre la procedencia de estos, tenemos que "evaluar su naturaleza y utilidad

---

[228] Véase Ap., pág. 1823.
[229] J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2nd ed., Publicaciones JTS, 2011, T. IV, pág. 1292. Véase también *Garriga, Jr. v. Tribunal Superior, supra.*
[230] Del *Informe de Conferencia con Antelación al Juicio* estipulado por las partes no aparece el nombre de Thomas Beggs como testigo de parte. Véase Ap., págs. 648-651.
[231] *San Lorenzo Trad., Inc. v. Hernández*, 114 DPR 704, 715 (1983).

a la luz de los hechos particulares del caso ante [nuestra] consideración, teniendo la parte que los reclama el deber de demostrar que el testimonio pericial presentado era necesario para que prevaleciera su teoría"[232].

Referente al trabajo pericial del Dr. Fabian Kirsch determinamos que la partida **no procede, dado a que su contribución en este pleito no fue usada en la vista para probar el caso de Soletanche.** En cambio, el testimonio del CPA Jorge Rodríguez Suarez fue utilizado por el Comisionado Especial para el cálculo de las cuantías reclamada por Soletanche, por lo cual su participación fue significativa para probar el caso de esta parte. Por este motivo**, la concesión del pago de costas por los honorarios de este último perito es razonables y por tanto procede**.

Corresponde determinar ahora, si el pago por la cuantía de costas relacionados al pago de los honorarios al Comisionado Especial es meritorio. Resolvemos en la afirmativa. En este caso, se nombró al Lcdo. Jorge Jiménez para que fungiera como Comisionado Especial por virtud de la *Orden sobre Designación de Comisionado Especial*, emitida el 12 de julio de 2014[233], la cual oficializó su nombramiento y en la cual se estableció los términos con respecto a sus honorarios. Igualmente se determinó que el pago se dividiría en partes iguales por cada una de las partes en este pleito[234]. Del expediente no se desprende objeción alguna en cuanto a estas condiciones. Tampoco se presentaron reparos referentes a estos gastos incurridos en el litigio. Siendo estos gastos necesarios para la resolución del caso, se **concede las costas solicitadas <u>por concepto a honorarios del Comisionado Especial</u>**. Aplicando el anterior razonamiento, **también son recobrables en costas, el**

---

[232] *Maderas Tratadas v. Sun All., supra,* pág. 935 citando a *Rodríguez Cancel v. A.E.E.,* 116 DPR 443, 461.
[233] Véase Ap., pág. 553.
[234] Véase Ap., pág. 554.

**pago del local donde se llevaron las vistas, un centro de la fraternidad AFDA y el servicio de taquigrafía de las vistas**. Lo anterior responde a que, estos son gastos accesorios a la gestión del Comisionado de los cuales todas las partes resultaron beneficiadas y por tanto fueron necesarios para la resolución del caso[235].

Finalmente, los *Fondos consignados en Corte por Orden Emplazamientos Citaciones-Testigos Juicio y Deposición* y *Sellos de Rentas Internas* son partidas recobrables según la jurisprudencia vigente[236] por estos tratarse de gastos necesarios y razonables para la tramitación del caso.

En síntesis, luego de un análisis ponderado acorde con lo establecido por nuestro ordenamiento jurídico, se concederán las siguientes partidas por concepto de costas:

a. Emplazamientos Citaciones-Testigos Juicio y Deposición ($430.60)
b. Sellos de Rentas Internas ($181.00)
c. Pago de honorarios al Comisionado Especial ($233,381.19)
d. Pago Honorarios al peritaje Incluyendo al contable ($76,426.00)
e. Taquígrafos ($20,526.72)
f. AFDA ($10,373.22)
g. Fondos consignados en Corte por Orden ($504.00)

Todo esto totaliza la suma de $341,822.73, cantidad que Soletanche podrá exigir por concepto de costas del litigio del caso de epígrafe.

**-C-**

Por último, nos corresponde revisar el *Memorando de Costas* presentado por LPC&D el cual está siendo cuestionado por la AAA. No obstante, antes de entrar a evaluar la solicitud de costas impugnada, debemos atender un planteamiento hecho por la AAA con respecto a las fiadoras. La AAA nos trae ante nuestra consideración un señalamiento de error relacionado a que el foro

---

[235] *Pereira v. I.B.E.C supra.*
[236] *Garriga, Jr. v. Tribunal Superior, supra.*

recurrido erró al declarar a lugar el *Memorando de Costas* a favor de las cuatro (4) fiadoras, cuando estas no comparecieron en la *Demanda contra Coparte* presentada por LPC&D la cual fue declarada Ha Lugar por el Comisionado Especial. No obstante, LPC&D aduce, que a pesar de que las fiadoras aparecen en la comparecencia de su solicitud de costas, quien está haciendo la reclamación del pago es LPC&D y así mismo se expresa en la súplica. Siendo esto así, el planteamiento que nos trae AAA sobre este asunto es irrelevante y por tanto concluimos que este error relacionado a las fiadoras no se cometió.

Resuelto lo anterior, nos resta por atender el Memorando de Costas propuesto por LPC&D, el cual evaluaremos a tenor con la modificación de la Sentencia apelada. Según indicamos, la Regla 44.1(a) de Procedimiento Civil, *supra,* establece que se concederán costas a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación o revisión. **La parte victoriosa es aquella a cuyo favor se resuelve una reclamación independiente, *a los fines de esa reclamación,* aun cuando en el litigio se hayan acumulado otras reclamaciones[237].** Colegimos, que siendo LPC&D la parte perdidosa no le corresponden costas

**V.**

En síntesis, las modificaciones a la Sentencia apelada son las siguientes:

> Soletanche recibirá la siguiente compensación de parte de LPC&D y sus fiadoras: pago del valor de las columnas dentro de la plataforma de trabajo construidas y no pagadas, $770,241.08, cambio de criterio en la instalación, máximo amperaje $1,249,630.00 y por la paralización al incorrectamente rechazarse la arena compactada en las columnas de piedra $314,777.50 para un total de $2,334,648.58. El TPI determinará el pago de intereses conforme con el subcontrato firmado por Soletanche y LPC&D.
>
> Solo LPC&D pagará el tiempo adicional en la obra causado por otros, incluyendo indecisiones, pruebas tardías,

---

[237] *J.T.P. Dev. Corp. v. Majestic Realty Corp.*, 130 DPR 456 (1992).

retrasos, detención ordenada por exigencias como equipo digital. Se le ordena al TPI determinar esta reclamación a base de la cláusula penal establecida en el subcontrato entre Soletanche y LPC&D, así como determinara el pago de intereses conforme con subcontrato firmado entre Soletanche y LPC&D.

Solo LPC&D tiene que pagar por los honorarios de abogado y el TPI tiene que determinar la cuantía de los honorarios a base del subcontrato entre Soletanche y LPC&D. Además, el TPI determinará el pago de intereses conforme al subcontrato firmado entre Soletanche y LPC&D.

La AAA pagará a Soletanche la cantidad de $969,720.74 por certificaciones adeudadas. Los intereses serán conforme con la Regla 44.3 (a) de Procedimiento Civil, *supra.*

El *Acuerdo Transaccional Parcial* firmado por la AAA y LPC&D en el 2008 establece lo siguiente en su cláusula DOS, lo cual debe aplicarse por el TPI, a saber:

**LPCD y la AAA acuerdan que del tribunal en su día determinar que procede el pago de alguna suma a Soletanche por LPCD por concepto de reclamaciones de Soletanche en la Demanda y que a su vez AAA tenga que pagar a LPCD por concepto de tales reclamaciones de Soletanche y que medie una determinación judicial final de que la AAA fue responsable de los actos en que se basa el derecho de cobro de Soletanche, la AAA pagará a LPCD las sumas pagadas por LPCD a Soletanche** sin los "mark ups" aplicables en conformidad con los términos del Contrato **excepto**: (i) que la AAA pagara a LPCD un seis por ciento (6%) por concepto de arbitrios, patentes, fianzas y seguros sobre toda partida que la AAA venga obligada a pagar bajo los incisos C, D y E de la segunda causa de acción de la Demanda de Coparte; y (ii) en el caso del inciso A y B de la segunda causa de acción de la Demanda de Coparte, en que la AAA pagara a LPCD al precio de la partida del contrato para dichos trabajos.

Por los fundamentos anteriormente expuestos, se modifica la *Sentencia* apelada y así modificada se confirma.

En cuanto a la *Resolución* emitida y notificada el 14 de julio de 2022 por el TPI, **modificamos** la determinación **a los fines de disponer que la cuantía concedida a favor de Soletanche por concepto de costas es $341,822.73**. En cuanto a la concesión de costas a favor de LPC&D, se declara No Ha Lugar.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones